**SECURITIES AND EXCHANGE COM-MISSION, Plaintiff,**

Securities Investor Protection Corporation, Applicant,

v.

**S. J. SALMON & CO., INC., Defendant.**

**No. 72 Civ. 560.**

United States District Court,

S. D. New York.

May 29, 1974.

Fine, Tofel & Saxl, New York City (Sherman J. Saxl, New York City, of counsel), for claimant-appellant.

Hughes, Hubbard & Reed, New York City (J. Bruce Ferguson, New York City, of counsel), for trustee.

## OPINION

BAUMAN, District Judge.

In this action, brought pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq., Myrna Chase appeals from an order of Hon. Asa S. Herzog, Bankruptcy Judge, sustaining the trustee's objections to claims which she had filed. For the reasons that follow, Judge Herzog's order is affirmed.

A hearing was held on the Chase claim before Judge Herzog on September 18, 1973. It was there established that Jack Chase had maintained a brokerage account with S. J. Salmon & Co., Inc., the debtor herein, in the name of his wife, Myrna Chase as custodian for Bonnie and Steven Chase, their children.[1] At some point late in January, 1972, he entered into a conversation with Bernard Greenberg, his broker at Salmon, concerning certain stock purchases to be made for them. The accounts of this conversation and of the events of the ensuing week offered by Chase and Greenberg at the hearing diverge significantly, and both will be touched upon briefly here. It is undisputed that earlier in January Chase had purchased for each of his children 1,500 shares of the stock of Jaymee Industries, Inc.[2] According to Greenberg, at their January conversation Chase expressed an interest in purchasing for his children the stock of Fiberstatics, Inc., of which he had made an earlier purchase in November, 1971. He suggested that the purchase of the Fiberstatics stock be financed from the proceeds of the sale of the 3,000 shares of Jaymee.

1. "Chase" as used hereafter will refer to Jack Chase, the only member of the family who actively participated in any of the transactions questioned here.

2. He purchased 1,000 shares for each child at 7½ on January 4, 1972, and an additional 500 shares for each at 9½ on January 11.

It was then agreed that Greenberg would wait until Jaymee was selling at 10 and Fiberstatics at 15; at that point, the 3,000 shares of Jaymee would be sold and 2,000 shares of Fiberstatics purchased. These transactions were executed on January 31, 1972 by a principal of Salmon, since Greenberg was sick on that day. On February 2, 1972, Salmon ceased doing business.[3] On February 7 the SEC commenced the instant action and this court, pursuant to SIPC's application, appointed a trustee to liquidate Salmon's business pursuant to 15 U.S.C. § 78eee(b)(3). Chase also received the confirmation slips for the purchase and sale on February 7.

Chase's account differs markedly. He testified that in December, 1971 he had read articles in the New York Times and Wall Street Journal questioning the ethics of certain practices in which Salmon was engaging. He therefore told Greenberg at the late January conversation that he wanted "to get out"; that is, he wanted all of his Salmon securities sold. He specifically expressed a desire to sell his Jaymee stock. On January 31 he was called by one Martin Tabak, a principal of Salmon and asked if he was willing to sell the Jaymee stock at 10. No mention was made of the Fiberstatics purchase, and Chase agreed to the sale. After receipt of the confirmation slips on February 7, Chase endeavored, without success, to convince the trustee that he had not authorized the purchase of Fiberstatics. He nevertheless admitted having filed claim forms dated April 5, 1972 in which he claimed ownership of the 2,000 shares of Fiberstatics.

At the conclusion of the hearing, Judge Herzog rendered an oral opinion in which he accepted the testimony of Greenberg as truthful and accordingly found that Chase had authorized the Fiberstatics purchase. He thereby sustained the trustee's objection to the Chase claim for $30,000 but held that Chase was entitled to receive the Fiberstatics stock. Chase subsequently filed a motion for rehearing pursuant to Rule 307 of the Rules of Bankruptcy Procedure and Rules 59 and 60 of the Federal Rules of Civil Procedure. Judge Herzog denied the motion in an opinion filed December 12, 1973.

Three points are raised in this appeal. First, Chase argues that Judge Herzog's finding that he authorized the Fiberstatics purchase should be set aside as clearly erroneous. Second, it is argued that even if authorized, the purchase was the result of a fraud perpetrated on Chase by Salmon and should therefore be rescinded. Third, it is contended that Judge Herzog erred in denying Chase's motion for a rehearing.

## I.

■■ It is well settled that the findings of fact of a bankruptcy judge will not be set aside unless they are clearly erroneous. See Bankruptcy Rule 810.[4] Furthermore, our court of appeals has stated that this rule "has been strictly enforced in this circuit, especially where credibility is a key factor." Margolis v. Nazareth Fair Grounds and Farmers Market, 249 F.2d 221 (2nd Cir. 1957). See also In re Nemerov, 134 F.Supp. 678 (S.D.N.Y.1955). Credibility was, of course, the sole question before Judge

---

3. At 5:30 P.M. on February 2 Salmon sent a telegram to the Securities and Exchange Commission stating that "it appears that our net capital is less than the minimum required to be maintained by the applicable net capital rules of the NASD."

4. Bankruptcy Rule 810:
   "Rule 810. Disposition of Appeal; Weight Accorded Referee's Findings
   Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses."

Herzog: the accounts of Chase and Greenberg conflicted directly, and he credited the testimony of Greenberg. I have carefully examined the hearing transcript and have concluded that although neither witness was a model of candor, there was ample reason to reject Chase's testimony. For example, although he testified that he never authorized the Fiberstatics purchase and had protested when he learned that such purchase had been made in his behalf, there is documentary evidence to the contrary. On February 8 he wrote the trustee requesting, inter alia, that the 2,000 shares of Fiberstatics stock be sent to him immediately.[5] Again, on April 5, 1972, he filed customer claim forms laying claim to the 2,000 Fiberstatics shares. One other contradiction in his testimony is worthy of note. He stated that he became disillusioned with Salmon as a result of reading various newspaper articles in December, 1971 and thereafter resolved to transact no further business with the firm. Yet it is undisputed that he made purchases of Jaymee stock through Salmon on January 4 and 11, 1972. Although Greenberg's testimony reveals a subsequent indulgence in ethically questionable practices,[6] I can hardly say that on this record Judge Herzog's acceptance of his testimony was clearly erroneous. Accordingly, I see no reason to disturb his finding that Chase authorized the Fiberstatics purchase.

## II.

Chase next argues that even if the Fiberstatics purchase is found to be authorized, it was fraudulently induced and must therefore be rescinded. This argument relies heavily on findings made by Judge Herzog in an opinion rendered August 8, 1973 concerning other aspects of the Salmon liquidation. He found that Salmon was the underwriter and principal market maker for nine stocks, including Fiberstatics. He further found that on January 28, 1972, the National Association of Securities Dealers (N.A.S.D.) conducted an examination of Salmon's books and concluded that there was a market for only 1,000 shares of each of these nine stocks and thus that the balance of such shares held by Salmon were valueless. Judge Herzog found further that because these shares could not be liquidated at prices even approaching those quoted by Salmon on its books, Salmon was insolvent as of January 31, 1972 and in violation of the N.A.S.D.'s net capital requirements. Chase therefore argues that Salmon's failure to disclose these facts in inducing Chase to purchase Fiberstatics stock constituted a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. He therefore seeks rescission of the transaction.

■ Judge Herzog concluded that even assuming *arguendo* that the Fiberstatics purchase was fraudulently induced, the Chase claim for rescission was not a "customer claim" within the meaning of § 6(c)(2)(A)(ii) of the Securities Investor Protection Act, 15 U.S.C. § 78fff(c)(2)(A)(ii).[7] He conclud-

5. However, in an affidavit submitted in support of the motion for rehearing, Chase contends that this letter was sent on the advice of an associate at his place of employment. He claims to have been counseled by one Warren Burd, a non-practicing member of the Bar, to obtain all of the stock in his account immediately and then to contest the propriety of the Fiberstatics purchase. Although he demanded delivery of the Fiberstatics stock, Chase states that "I did not by this act intend to consent to the improper transaction." (¶ 3 of the Chase affidavit of December 5, 1973).

6. Greenberg admitted (Hearing Transcript, 28–30) that on one occasion after leaving Salmon and while employed at another brokerage firm he made a purchase of stock for Chase's account that Chase had not authorized.

7. 15 U.S.C. § 78fff(c)(2)(A)(ii):
"(ii) 'customers' of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to

ed that Chase could bring the fraud claim as a general creditor which, if allowed, would be satisfied out of Salmon's general estate. My reading of the Act and its legislative history leads me to conclude that this decision was plainly correct.

■ The principal purpose of the Act was to protect investors against financial losses arising from the insolvency of their brokers. The House Report in support of the legislation [8] noted that customers often encounter serious delays in recovering cash or securities from insolvent brokers and upon occasion are unable to recover fully what was due them. The Act was thus intended to provide protection for such purchasers analogous to that enjoyed by bank depositors under the F.D.I.C. Customer claims can be satisfied by the trustee in various ways. Specifically identifiable property in the debtor's possession belonging to the customer is returned to him.[9] All other property held by the debtor for the account of customers than that which is specifically identifiable, forms a "single and separate fund" in which all customers are entitled to share pro rata.[10] In addition, SIPC will advance funds to the trustee to pay claims up to $50,000 per customer.[11] The trustee may then reimburse customers from the single and separate fund, from the monies advanced by SIPC, or from a combination of both sources.[12] See also S.E.C. v. Aberdeen Securities Co., Inc., 480 F.2d 1121 (3rd Cir. 1973); S.E.C. v. Alan F. Hughes, Inc., 461 F.2d 974

(2nd Cir. 1972); S.E.C. v. Milner, 474 F.2d 162 (1st Cir. 1973).

■ I conclude that this statutory scheme was designed to facilitate the return of the property of customers of insolvent brokerage firms or, where this cannot be done, to reimburse such customers if their property has been lost or misappropriated. Misappropriation would, of course, include the use of the customers' money to effect unauthorized purchases of securities. Thus if Judge Herzog had found the Fiberstatics purchase to have been unauthorized Chase would possess a valid customer claim for the return of the $30,000.[13] In the present posture of the case, however, Chase's only customer claim is for his specifically identifiable property, namely, the 2,000 shares of Fiberstatics. I therefore agree with Judge Herzog that Chase must pursue his fraud claim as a general creditor, and must look for its satisfaction to the debtor's general estate, not to the single and separate fund.

### III.

■ Finally, Chase claims that Judge Herzog erred in denying his motion for a rehearing. Such motions are addressed to the sound discretion of the bankruptcy court. Wayne United Gas Co. v. Owens-Illinois Glass Co., 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557 (1937); Pfister v. Northern Illinois Finance Corp., 317 U.S. 144, 63 S.Ct. 133, 87 L. Ed. 146 (1942); Frasch v. Wilson, 413 F.2d 69 (9th Cir. 1969). In his motion, Chase placed greatest emphasis on the

---

the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor."

8. House Report No. 91–1613, set out at 1970 U.S.Code Cong. and Admin.News p. 5254 et seq.

9. 15 U.S.C. § 78fff(c)(2)(C).

10. 15 U.S.C. § 78fff(c)(2)(B).

11. 15 U.S.C. § 78fff(f).

12. To the extent that a customer's claim is satisfied by advances from SIPC, SIPC is subrogated to the claims of such customer against the debtor's property. 15 U.S.C. § 78fff(f)(1).

13. This point is conceded by the trustee. See trustee's brief on appeal, p. 14.

series of misfortunes that had befallen him with regard to the attorneys he had previously retained in this action. His first attorney, to whom he paid $10,000, failed even to file a claim in his behalf and was subsequently indicted and convicted for this very malfeasance. His second attorney, who conducted the pre-hearing depositions, was hospitalized with a heart attack three days before the September 18 hearing. Chase thus contended that his third attorney, who participated in the hearing, was inadequately prepared. Judge Herzog found this plea unpersuasive. He noted that no request for an adjournment had been made prior to the hearing, and adverted to an affidavit submitted by counsel for the trustee which stated that Chase's third attorney had advised him a full month prior to the hearing date that he would represent Chase at the hearing. Given such findings I cannot conclude that Judge Herzog abused his discretion in denying Chase's motion for a rehearing.

For the reasons herein stated, the decision of the bankruptcy court is affirmed.

So ordered.