**In re MV SECURITIES, INC., a/k/a Multi-Vest Securities, Inc., Debtor.**

**Bankruptcy No. 84–5393 A (PBA).**

United States Bankruptcy Court, S.D. New York.

April 2, 1985.

Wilson, Elser, Edelman & Dicker, New York City, for claimant Viola Bucchino; Edward J. Boyle, New York City, of counsel.

Gold, Farrell & Marks, New York City, for Lee Richards, III, Trustee; Raymond J. Heslin, New York City, of counsel.

Theodore H. Focht, General Counsel, Washington, D.C., for Securities Investor Protection Corp.; Michael E. Don and Stephen P. Harbech, Washington, D.C., of counsel.

MEMORANDUM DECISION AND ORDER AFFIRMING TRUSTEE'S DECISION THAT CLAIM NO. 1324, VIOLA BUCCHINO, IS NOT A CUSTOMER CLAIM

PRUDENCE B. ABRAM, Bankruptcy Judge.

On March 14, 1984, a protective order under the Securities Investor Protection

Act of 1970, as amended ("SIPA" or "Act"), 15 U.S.C. § 78eee(b)(1), was entered in this case adjudging and decreeing that the customers of MV Securities, Inc. a/k/a Multi-Vest Securities, Inc. ("MV" or "Debtor") were in need of the protection afforded them under SIPA and commencing an orderly liquidation. In seeking the order the Securities Investor Protection Corporation ("SIPC") alleged that MV was not in compliance with applicable financial responsibility requirements of the Securities Exchange Act of 1934 and that it had failed to meet obligations to its customers. Thereafter, Lee Richards was appointed the Trustee and the case was referred from the District Court to the Bankruptcy Court as contemplated by SIPA.

In accordance with an order signed on March 27, 1984, the Trustee notified all persons that anyone who wished to assert a customer claim must file a claim on or before October 5, 1984. In a subsequent order dated June 11, 1984, the court established a procedure to be followed by the Trustee in handling protests of the Trustee's determinations with respect to the status or amount of any asserted customer claim. The present matter involves one such asserted customer claim, its disapproval by the Trustee and subsequent submission to this court for resolution.

Viola Bucchino filed a claim asserting customer status in the amount of $164,011.82 based on a National Association of Securities Dealers ("NASD") arbitration award in her favor rendered February 2, 1984, a date approximately five weeks before the SIPA order was signed. The relevant provisions of the award provide as follows:

"And, [the arbitrators] having heard and considered the proofs of the parties, have decided and determined that in full and final settlement of all claims asserted in the above-captioned matter:

"(1) Multi-Vest Securities, Inc. shall pay to the Claimant the sum of One Hundred Fifty-Four Thousand One Hundred Eighty-Two Dollars and Sixty-Seven Cents ($154,182.67) plus interest on that amount at the rate of 9% on a 360 day basis from July 1, 1983 to date of payment. If Multi-Vest Securities, Inc. is unable to pay to Claimant any part of or all of the above-mentioned sum of money, James Stephens and William Sigler[1] are jointly and severally liable for and shall pay to Claimant that part of or all of the above-mentioned sum of money not paid to Claimant by Multi-Vest Securities, Inc.

"(2) And, that upon payment of the above-mentioned sum of money the Claimant shall transfer possession and ownership of the following bonds to Multi-Vest Securities, Inc.:

"$85,000 Washington Public Power Supply System (Nuclear Projects Nos. 4 and 5) 12½% due 7/1/2010

"$35,000 Washington Public Power Supply System (Nuclear Projects Nos. 4 and 5) 6.125% due 7/1/2018."

A review of the background to the arbitration award is essential to understanding the basis of Ms. Bucchino's claim to customer status.[2] At the time of the events in question Ms. Bucchino was 75 years old. Apparently as a result of a newspaper advertisement placed by MV referring to 13.6% triple tax exempt bonds, Ms. Bucchino visited the offices of MV. At the time of her initial visit to MV in the fall of 1982, Ms. Bucchino owned New York City and New York State Bonds and certain other securities having a face value of approximately $212,000. William Sigler, an MV account representative, induced Ms. Bucchino to sell her existing securities and to buy $320,000 face amount of Washington Public Power Supply System Bonds,

---

**1.** James Stephens was the president and sole shareholder of MV and William Sigler was Ms. Bucchino's account representative.

**2.** No evidentiary hearing was held and the facts have been taken from the papers submitted by the parties. For the purposes of this decision only, the court has assumed the facts most favorable to Ms. Bucchino to be true.

Projects #4 and #5 ("WPPSS Bonds").[3] After her existing securities were sold and the WPPSS Bonds purchased, MV made a demand on Ms. Bucchino to make payment of an additional $95,000 to cover the portion of the cost of the WPPSS Bonds in excess of the proceeds of the sale of her existing securities. Ms. Bucchino refused to pay the $95,000 and MV thereafter sold $145,000 face amount of the WPPSS Bonds and applied the proceeds against this amount.

The arbitration was commenced by Ms. Bucchino in early 1983 predicated on the grounds that the WPPSS Bonds were not a suitable investment for someone of her age and stated investment objectives of safety and conservation. It was alleged that MV knew or should have known that the WPPSS Bonds were speculative investments, that there were problems associated with the projects underlying the bonds, that the credit rating of the issues were in jeopardy and that the bonds would be difficult to sell. It was further alleged that MV did not communicate any of this adverse information to Ms. Bucchino. The statement of claim in the arbitration puts the matter in summation as follows:

"12. Respondents [MV and the two individuals] have liquidated a conservative near term portfolio with a face value of approximately $212,000 and all that claimant [Ms. Bucchino] has in return at this point is $165,000 of face value Washington State bonds having maturities next century and a present market value of less than half this amount."

In the arbitration, Ms. Bucchino sought to be restored to her position at the time she opened her account either by means of re-establishment of her portfolio or through an award of money damages.

The sale of WPPSS Bonds to Ms. Bucchino was not an isolated instance of the sale of these securities by MV to apparently unsuitable customers. Several similar claims have been asserted. However, Ms. Bucchino is the only claimant who had both promptly sought arbitration and obtained an arbitration award in her favor[4] prior to the SIPA protective order.

Ironically, in light of the court's holding that Ms. Bucchino's claim is not a SIPC-protected customer claim, Ms. Bucchino's situation was one of the grounds on which the Securities and Exchange Commission commenced an investigation of MV in the fall of 1983. The findings of that SEC investigation formed the basis for the SIPA case.

Ms. Bucchino argues that MV was obligated by the arbitration award and by the rules and regulations of NASD to credit her account with the amount of the award and that therefore her claim is a customer claim. As she puts it

"In effect, the Award rescinded Ms. Bucchino's prior trades and directed that monies be credited to her. The Award, rendered on February 2, 1984, effectively was a determination that Multi-Vest held this amount of Ms. Bucchino's property, in the form of cash, for her benefit." Memorandum in Opposition to the Denial of Viola Bucchino's Customer Claim dated September 20, 1984 at 7–8.

The Trustee urges that as of the filing date the arbitration award had not been reduced to judgment, MV had not paid the judgment, and Ms. Bucchino had not returned the WPPSS Bonds as directed. He states

"My denial of Mrs. Bucchino's claims was based on the fact that her account did not contain either cash or securities as of the filing date, March 14, 1984, because her bonds had already been delivered to her. Consequently, Mrs. Bucchino does not meet the definition of a

---

3. Apparently Mr. Sigler indicated that the advertised 13.6% triple tax exempt bonds were no longer available and "switched" Ms. Bucchino to the WPPSS Bonds.

4. Ms. Bucchino's efforts to convert the award into a judgment against MV were halted by the

SIPA protective order. Her efforts to convert the award into a judgment against the co-obligors, Sigler and Stephens, have been stayed by the state court until it is clear whether she will recover from the MV estate the amount owed.

customer entitled to a SIPA advance. It is undisputed that MV held no securities for Mrs. Bucchino, and her arbitration award, even if it had been reduced to judgment, which it was not, does not transform a general creditor claim for rescission into a SIPA-protected customer claim. SIPA protection extends only to the safe return of the contents of a claimant's account, which has already been accomplished."

Any resolution of the issue of the status of Ms. Bucchino's status must begin with an analysis of the statute itself as SIPA uses the term 'customer' as a term of art. *In re Stalvey & Associates, Inc. (Securities Investor Protection Corp. v. Wise )*, 750 F.2d 464, 468 (5th Cir.1985). The term "customer" is defined in 15 U.S.C. § 78*lll* as follows:

"(2) Customer.—The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—

"(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

"(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor."

SIPA states that the purposes of a liquidation proceeding under the Act shall be

1) delivery of customer name securities to customers and distribution of customer property and net equity claims as promptly as possible after appointment of a trustee,

2) sale or transfer of offices and other productive units of the debtor's business,

3) enforcement of rights of subrogation provided by SIPA, and

4) liquidation of the debtor's business.

15 U.S.C. § 78fff(a). In order to facilitate the prompt return to customers, SIPC may make advances to the trustee and becomes subrogated to the customer claims paid to the extent of the advances. Repayment to SIPC of its advances must be made before payment to general unsecured creditors. 15 U.S.C. § 78fff-3(a). The SIPC advance is limited to $500,000 per customer, no more than $100,000 of which may be based on a customer claim to cash, as opposed to securities. The Trustee discharges customer obligations of the debtor from the debtor's books and records insofar as the debtor's obligations are ascertainable from them or from such other evidence as otherwise establishes the claim to the satisfaction of the trustee. 15 U.S.C. § 78fff-2(b).[5] A customer's net equity is the dollar

---

5. The express recognition in SIPA that the debtor's books and records may not be accurate for the purpose of establishing a customer account is particularly pertinent to Ms. Bucchino's claim. It is clear that MV's failure to reflect the arbitration award on Ms. Bucchino's account records would not, standing alone, justify the Trustee's denial of customer status to Ms. Buc-chino's claim. Given that historically SIPA evolved at a time of severe back office problems in the securities industry resulting in substantial inaccuracies in account records, it is clear from 15 U.S.C. § 78fff-2(b) that Congress did not intend to base SIPC coverage solely on what the debtor's books stated.

amount of the account determined by calculating the liquidation value of all securities positions on the filing date, subtracting any indebtedness of the customer to the debtor on the filing date, and adding any payment of that indebtedness made with the approval of the trustee. 15 U.S.C. § 78*lll* (11).[6]

"The principal purpose of the Act was to protect investors against financial losses arising from the insolvency of their brokers. The House Report in support of the legislation noted that customers often encounter serious delays in recovering cash or securities from insolvent brokers and upon occasion are unable to recover fully what was due them. *The Act was thus intended to provide protection for such purchasers analogous to that enjoyed by bank depositors under the F.D.I.C."* *Securities and Exchange Commission v. S.J. Salmon & Co., Inc.,* 375 F.Supp. 867, 871 (D.C.S.D. N.Y.1974) (Emphasis added).

The decisional law which has developed under SIPA accords to the "customer" definition an interpretation that follows logically from the bank insurance analogy. See, e.g., *SEC v. S.J. Salmon & Co., Inc.,* 375 F.Supp. 867, 871 (D.C.S.D.N.Y.1974); *SEC v. Kenneth Bove & Co., Inc.,* 378 F.Supp. 697, 699 (D.C.S.D.N.Y.1974). The cases hold that the "SIPA does not protect customer claims based on fraud or breach of contract." *SEC v. Howard Lawrence & Co., Inc.,* 1 B.C.D. 577, 579 (Bkrtcy.S.D.N. Y.1975). "[I]t seems plain that SIPA's primary intent and policy are to protect customers who have cash and securities being held for them by a broker dealer, rather than to serve as a vehicle for the litigation of claims of fraud or violations of Rule 10b–5 * * * * " *SEC v. North American Planning Corporation,* 72 Civ. 3158 (Bkrtcy.S.D.N.Y.1974) (Unpublished Opinion at 4). "To require the Trustee to use SIPC funds to pay damages for a breach of contract claim against the debtor would not serve the congressional purpose of avoid-

ing the domino effect inherent in unfulfilled open contractual commitments and would only serve to give a windfall to those who are general creditors based upon breach of contract claims." *SEC v. Kelly, Andrews & Bradley, Inc.,* 385 F.Supp. 948, 949, 952–3 (D.C.S.D.N.Y.1974). Although the emphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in the Second Circuit, the court has nevertheless approved a narrow interpretation of the "customer" definition in SIPA. See, *SIPC v. Morgan, Kennedy & Co.,* 533 F.2d 1314 (2d Cir.), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); *SEC v. F.O. Baroff,* 497 F.2d 280 (2d Cir.1974). Accord, *In re Stalvey & Associates, Inc.,* 750 F.2d 464 (5th Cir. 1985).

There can be no doubt that Ms. Bucchino is an innocent member of the investing public who has been ultimately injured by the insolvency of a brokerage house. She is not an insider or quasi-insider nor did she engage in transactions designed to improve the capital ratio of the firm. However, Ms. Bucchino's claim is in essence one of fraud or overreaching. It is not denied that she authorized the sale of her existing securities and the purchase of the WPPSS Bonds. Nor is it asserted that MV failed to deliver the WPPSS Bonds to her. Ms. Bucchino simply alleges that MV was duty bound by the know-your-customer and suitability rules not to have induced her to give her consent to the sale of her existing bonds and the purchase of the WPPSS Bonds.

Assuming that MV was acting only as a broker with respect to the WPPSS Bonds, MV profited from the transactions with Ms. Bucchino only to the extent of receiving sales commissions on the sales and purchases, an amount presumed to be less than the loss in value to Ms. Bucchino of the substitute portfolio. Thus, in order to satisfy the arbitration award to Ms. Bucchino, MV would have been required to reach

---

**6.** There is no need on the facts of this case to explore the topic of "customer name securities". 15 U.S.C. § 78*lll* (3). MV did not hold any securities for Ms. Bucchino on the filing date and it

is not alleged that it did. For that reason, Ms. Bucchino recognizes that SIPC coverage, if any, for her account would be subject to the $100,000 cash limitation.

into its own pocket, to the extent that the award exceeded the commissions earned, to satisfy the award. Viewed in this economic light, there is a logical basis to the decisional interpretation of SIPA.

The wisdom of the legislative limitation created by Congress can, of course, be questioned. A persuasive case could be made for expending coverage to claims such as that of Ms. Bucchino. Firstly, the injury to the public investor's pocketbook is the same when the injury results from unsuitable purchases [7] as when it results from a back office problem which results in the brokerage house becoming unable to deliver a customer's cash or securities. Secondly, SIPC and the SEC are in a position to minimize the number of such claims against any brokerage house by exercising their statutory powers of regulation. Thirdly, SIPC insurance is already limited in amount to a total of $500,000, of which no more than $100,000 can be a claim for cash. Thus, even at the present coverage limits the liability exposure is not unlimited and separate coverage limits could be set for these types of claims. However, it is not for the courts to legislate.

The salutory principle of *stare decisis* requires that this court follow the interpretations of SIPA provided by the Second Circuit and other courts. In doing so, this court concludes that Ms. Bucchino's claim falls into the category of claims that have been held are not covered by SIPA and therefore not entitled to SIPC protection. It must be presumed that Congress has approved the construction of the definition of "customer." provided by the courts as Congress enacted various amendments to SIPA in 1978 but made no change to include such claims in the protected customer class.

Therefore this court affirms the Trustee's determination that Claim No. 1324, of Viola Bucchino, is not a customer claim. As a general unsecured claim, it appears unlikely that Ms. Bucchino will ever recover anything from the estate of MV and that her principal remedy must be against the co-obligors on the arbitration award, Messrs. Sigler and Stephens.

It is so ordered.

---

7. Additional categories of customer claims which have been denied SIPC coverage are those for improper executions and for securities laws violations. Each of these various types of claims present separate policy issues.