### In re ADLER COLEMAN CLEARING CORP., Debtor.

**Bankruptcy No. 95–08203 (JLG).**

United States Bankruptcy Court, S.D. New York.

July 18, 1997.

Stefanie H. Roth, Darren Hutchinson, Cleary, Gottlieb, Steen & Hamilton, New York City, for the Trustee.

Michael Carlinsky, John F. Olsen, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for RCM Capital Management, L.L.C.

Cirino M. Bruno, Gusrae Kaplan & Bruno, New York City, for Paul Russo.

Michael H. Lord, Kittay Gold & Krebsbach, P.C., New York City, for LEK Schoenau & Co.

Andrew J. Campanelli, Perry, Kearon & Campanelli, L.L.P., Westbury, NY, for Schitos.

Charles L. Chapman, Dallas, TX, pro se.

Kenneth J. Caputo, Associate General Counsel, Securities Investor Protection Corp., Washington, DC.

### MEMORANDUM DECISION UPHOLDING THE TRUSTEE'S DETERMINATION DENYING THE CLAIMS BY RCM CAPITAL MANAGEMENT, L.L.C. AND EXPUNGING THE OBJECTIONS FILED WITH RESPECT TO THAT DETERMINATION

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Edwin Mishkin, Esq., as the court-appointed Securities Investor Protection Act ("SIPA") trustee for the liquidation of the business of Adler Coleman Clearing Corp. ("Adler Coleman" or the "debtor"), seeks an order upholding his determination of the "customer claims" asserted by RCM Capital Management Corp. ("RCM" or the "claimant") on behalf of its clients and expunging RCM's objections to the trustee's determinations of those claims. The Securities Investor Protection Corporation ("SIPC") supports the motion. We grant the motion.

#### Background

SIPC is a non-profit corporation whose members include most interstate broker-dealers. SIPA establishes SIPC and, among other things, sets forth the procedures for liquidating financially troubled SIPC members. A broker or dealer automatically be-

comes a member of SIPC upon registration as a broker or dealer with the Securities and Exchange Commission ("SEC") under § 15(b) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78ccc(a)(2)(A) SIPC initiates a SIPA liquidation by filing an application for a customer protective decree in federal district court. 15 U.S.C. 78eee(a)(3).

SIPA protects customers of registered broker-dealers who have entrusted those broker-dealers with cash or securities in the ordinary course of business. *Matter of Oberweis Securities, Inc.*, 135 B.R. 842, 845 (Bankr.N.D.Ill.1991). For these purposes, a "customer" is

> any person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities....

15 U.S.C. § 78*lll*(2). *See In re Omni Mutual, Inc.*, 193 B.R. 678, 681 (S.D.N.Y.1996).

SIPA liquidations generally involve customer claims and claims of general unsecured creditors, which are satisfied out of a customer estate and general estate, respectively. The customer estate—which is not available to satisfy the claims of general unsecured creditors—is a fund consisting of customer-related assets. *See* 15 U.S.C. § 78lll(4). It is distributed pro-rata among customers. *See* 15 U.S.C. § 78fff–2(c)(1).

A SIPA trustee discharges a debtor's obligations to customers to the extent that they may be determined to the trustee's satisfaction from the debtor's books and records. 15 U.S.C. § 78fff–2(b). SIPC advances funds to the trustee—limited to $500,000 per customer of which no more than $100,000 may be based on a customer claim to cash, as opposed to securities—as necessary to enable him to satisfy customer claims, within the limits of SIPA protection. SIPC becomes subrogated to customer claims paid to the extent of such advances. See 15 U.S.C. §§ 78fff–3(a), 78fff–2(c)(1), 78lll(11). *See*

*also Matter of Oberweis Securities, Inc.*, 135 B.R. at 845 (SIPC only advances funds to the extent that the broker's assets are insufficient to satisfy obligations to clients; SIPC's exposure is limited to allowable SIPA claims up to $500,000 per customer of which no more than $100,000 may represent reimbursement of cash); *In re MV Securities, Inc.*, 48 B.R. 156, 159 (Bankr.S.D.N.Y.1985) (same). Those advances are repaid from funds in the general estate prior to payment on account of general unsecured claims. 15 U.S.C. § 78fff–3(a).

The value of a customer's account, or its "net equity", is the measure of its preferred SIPA customer claim. "Net equity" is the dollar amount of the customer's account or accounts and is determined by—

> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date; plus
>
> (C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff–2(a) of this title)....

15 U.S.C. § 78*lll*(11). *See, e.g., SIPC v. Vigman*, 803 F.2d 1513, 1516 (9th Cir.1986) (claimant's net equity equivalent to amount that broker would have owed claimant had it liquidated holdings on the date SIPC filed protective decree, less outstanding debt owed by claimant to debtor). The trustee values each customer's account as of the date the petition is filed. 15 U.S.C. § 78fff–2(b). *See also SEC v. Aberdeen Securities Co.*, 480 F.2d 1121, 1123–24 (3d Cir.) (SIPA customer account valued as of the filing date), *cert. denied sub nom. Seligsohn v. Securities and Exchange Commission*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); *Matter of Atkeison*, 446 F.Supp. 844, 847 (M.D.Tenn. 1977) (in determining what securities are owed to customer, trustee must examine

books and records of debtor as of filing date); *Matter of Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 892 (D.N.J.1988) ("When distributing securities to customers in satisfaction of net equity claims, 'all securities shall be valued as of the close of business on the filing date.'") (quoting 15 U.S.C. § 78fff–2(b)). SIPC may not advance funds for claims against the broker that do not fall within the narrow scope of a customer's net equity claim. 15 U.S.C. § 78fff–3(a); SIPC Rules, 17 C.F.R. Part 300.500 to Part 300.503.

### Facts

On February 27, 1995 (the "Filing Date"), the Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, entered an order pursuant to 15 U.S.C. § 78eee(b) appointing Mishkin as trustee (the "Trustee") for the liquidation of the debtor's business and removing the liquidation proceedings to this court. Debtor was a SIPC member and a broker-dealer registered with the SEC. It was primarily a clearing firm acting on a fully disclosed basis for approximately 42 introducing firms. It handled approximately 66,000 active customer accounts. Those accounts were frozen as of the Filing Date and debtor's customers could not trade in, or otherwise access, them.

Pursuant to SIPA, we fixed September 22, 1995 (the "Bar Date") as the last day for debtor's former customers to file customer claims against debtor. Pursuant to our March 10, 1995 order (the "Housekeeping Order") we established procedures governing the filing of customer claims against debtor and the Trustee's review, analysis, liquidation and payment thereof. Among other things, that order directs each person holding a customer claim to file it on or before the Bar Date. It directs the Trustee to review each such claim to determine what portion, if any, thereof merits preferred SIPA customer claim status. Where the Trustee believes such status is appropriate, the order directs him to calculate the customer's net equity and notify the claimant of that determination by letter. The order mandates that any customer who objects to the Trustee's SIPA claim determination file a written objection setting forth in detail the basis for the objection within 30 days of the date of the determination. Then the Trustee must schedule a hearing on the issues raised by the claimant.

RCM is a registered investment advisor that asserts customer claims (the "RCM Claims") on behalf of six clients who held accounts (the "RCM Accounts") with the debtor[1]. The undisputed facts surrounding the RCM Claims are as follows. RCM had discretionary authority to execute securities transactions in the RCM Accounts on behalf of its clients. Kalin Associates, Inc. ("Kalin") was the introducing broker servicing those accounts. Prior to the Filing Date, on or about February 24, 1995, RCM instructed Kalin to purchase, in the aggregate, 49,800 shares of Abbott Laboratories, Inc. ("Abbott Labs") on behalf of those customers. Kalin purchased the Abbott Labs stock through debtor and the scheduled settlement date for those purchases was March 3, 1995 (four days after the Filing Date). On the Filing Date, debtor sent written trade confirmations to RCM showing that each customer's account held Abbott Labs stock. The trade terms were "delivery-versus-payment" ("DVP") or "receipt versus-payment" ("RVP"). In other words, on the settlement date, payment for the securities was to be made simultaneously with delivery of the stock certificates.

Thus, as of the Filing Date, debtor's books and records showed in the aggregate that the RCM Accounts contained 49,800 shares of Abbott Labs having a Filing Date value of $1,749,166.67 and unpaid debits totaling $1,763,368.20. Debtor's records reflect that the debits arose from the purchase of the Abbott Labs securities on February 24, 1995.

In furtherance of the Housekeeping Order, the Trustee mailed claim forms to all of debtor's known customers. "Item 1" of the claim form covers "[c]laim[s] for money bal-

---

1. RCM filed claims for accounts held by the following investors: Entergy Services, Inc., San Francisco City and County Employees' Retirement System, The Boeing Company Employee Retirement Plan, Iowa Public Employees' Retirement System, Iowa Public Employees' Retire- ment System and Pacific Telesis group Master Pension Trust. Each investor also filed a duplicative claim on its own behalf. Since RCM filed the objection to the Trustee's determination of these claims, RCM is treated as the claimant for purposes of this motion.

ances as of February 25, 1995". "Item 2" covers "[c]laim[s] for securities as of February 25, 1995". In relevant part, the instructions accompanying the claim form state as follows:

> **Item 1** is to be completed if on the date shown, Broker owed you cash or if you owed the broker cash. If the Broker owes money to you, please indicate the amount in the space provided [Item 1a]. If you owe the broker money, please so indicate in the space provided [Item 1b]. If the Broker owes you securities and you wish to receive those securities without deduction, then you must enclose your check for the amount [of the debit] payable to "Edwin B. Mishkin, Esq., Trustee for Adler, Coleman Clearing Corp." **Payments not enclosed with this claim form will not be accepted by the trustee for the purposes of determining what securities are to be distributed to you.**

(Emphasis original).

On its claim form, RCM claimed a total of 49,800 shares of Abbott Labs. It did not mention the debit balance and did not remit a check payable to the Trustee for the debits in the claimed accounts when it filed the RCM Claims. The Trustee denied the RCM Claims, stating:

> According to the books and records of Adler, Coleman Clearing Corp., as of February 27, 1995 ("the Filing Date"), there were 49,800 shares of ABBOTT LABORATORIES in the above accounts with a value of $1,749,166.67. There were also unpaid debits of $1,763,368.20 in these accounts. Because the debits were not paid within the applicable time period, the Trustee has calculated the net equity in these accounts pursuant to the Securities Investor Protection Act. The calculation of the net equity as of the Filing Date is reflected on the enclosed schedule and you owe the debtor a debit balance of $14,-201.53. Therefore you must, and the Trustee hereby demands that you, send a check for that amount, made out to "Edwin B. Mishkin, Esq., Trustee for the Liquidation of Adler, Coleman Clearing Corp."....

*See* Notice of Trustee's Determination of Claim, p. 2.

RCM filed a timely objection to the Trustee's determination of the claims. In addition to objecting to those determinations, RCM seeks an order directing him to close out the transaction by taking $1,763,368.20 and delivering to it 49,800 shares of Abbott Labs, or its current value.

It is undisputed that RCM's customers are retirement plans and pension funds. Likewise, it is uncontested that by virtue of ERISA custody rules, which insure, among other things, compliance with Internal Revenue Code of § 401(f) and Treasury Regulations 1.401(f)–1 and 1.408–2, those customers required that all securities trades made in their accounts be executed on a DVP basis. It is further uncontested that debtor was aware of the need for DVP terms for RCM's trades and that all of RCM's security transactions introduced by Kalin and cleared through debtor were executed on a DVP basis. "Under a typical DVP/RVP arrangement, the DVP/RVP account holder purchases securities through a broker-dealer who gets paid after delivering the securities to the bank. When the account holder sells securities through broker-dealers, the bank delivers the securities to the broker-dealer in return for cash payment." *SEC v. Hansen,* 726 F.Supp. 74, 75 n. 4 (S.D.N.Y.1989). When a transaction is not DVP/RVP, the party who first performs under the contract is at risk until the other party performs. RCM contends that by virtue of the DVP limitations imposed by ERISA, it was barred by law from paying the trustee on account of the Abbott Labs securities unless the trustee simultaneously delivered the securities. For that reason, and others, RCM contends that the Trustee should have completed the open transactions in the RCM Accounts and that he should be directed now to deliver 49,800 shares of Abbott Labs, or its cash equivalent, to RCM for the benefits of its customers.

### Discussion

■ A SIPA trustee generally is not free to close out or complete open contracts of the debtor:

> Any contract of the debtor for the purchase or sale of securities in the ordinary course of its business with other brokers or dealers which is wholly executory on the filing date shall not be completed by the

trustee, except to the extent permitted by SIPC rule.

15 U.S.C. § 78fff–2. Nonetheless, RCM first contends that SIPC's Rules Regarding Closeout or Completion of Open Contractual Commitments, 17 C.F.R. §§ 300.300–300.307 (1996) (the "Closeout Rules") mandate that the Trustee complete the Abbott Labs transactions. It argues that under 17 C.F.R. § 300.300(b), the Trustee's failure to complete the Abbotts Labs transactions constitutes a "failed to deliver," and therefore, the transactions were "open contractual commitments" of debtor on the Filing Date pursuant to 17 C.F.R. § 300.300(c).[2]

■ RCM contends that under SIPC Rules, 17 C.F.R. § 300.300(d), it is Kalin's customer[3] and Kalin is "another broker or dealer" for purposes of SIPA and the Closeout Rules. From that, RCM reasons that because the trades are open contractual commitments with a customer of another broker or dealer, the Trustee must complete or close them out under 17 C.F.R. § 300.301 and in accordance with 17 C.F.R. § 300.302(a)[4].

2. Sections 300.300(b) and (c) provide that:

(b) The term "failed to deliver" shall mean a contractual commitment of the debtor, made in the ordinary course of business, to deliver securities to another broker or dealer against receipt from such broker or dealer of the contract price in cash: Provided, That the respective obligations of the parties remained outstanding until the close of business on the filing date.

(c) The term "open contractual commitment" shall mean a failed to receive or a failed to deliver which had a settlement date prior to the filing date and the respective obligations of the parties remained outstanding on the filing date or had a settlement date which occurs on or within three business days subsequent to the filling date: Provided, however, That the term "open contractual commitment" shall not include any contractual commitment for which the security which is the subject of the trade had not been issued by the issuer as of the trade date.

SIPC Rules, 17 C.F.R. § 300.300(b), (c).

3. Section 300.300(d) states that

The term "customer" shall mean a person (other than a broker or dealer) in whose behalf a broker or dealer has executed a transaction out of which arose an open contractual commitment with the debtor....

Id. § 300.300(d).

4. Section 300.301 states:

An open contractual commitment shall be closed out or completed if:

(a) The open contractual commitment:

(1) Arises from a transaction in which a customer (as defined in § 300.300) of the other broker or dealer had an interest. For the purposes of this rule a customer is deemed to have an interest in a transaction if (i) the other broker was acting as agent for the customer ...; and

(2) (i) Had a settlement date on or within 30 calendar days prior to the filing date and the respective obligations of the parties remained outstanding on the filing date or had a settlement date which occurs on or within three business days subsequent to the filing date; and

(ii) Had a trade date on or within three business days prior to such settlement date; and

(b) The other broker or dealer can establish to the satisfaction of the trustee through appropriate documentation that:

(1) In the case of a broker or dealer who maintains his records on a specific identification basis:

(i) The open contractual commitment arose out of a transaction in which his customer had such an interest, and

(ii) In the case of a failed to deliver of the debtor, as of the filing date such broker's or dealer's customer's interest had not been sold to such broker or dealer....

17 C.F.R. § 300.301(a), (b)(1)(i), (ii).

Section 300.302(a) states:

(a) The closeout or completion of an open contractual commitment meeting the requirements of § 300.301 shall be effected only:

(1) By the buy-in or sell-out of the commitment by the other broker or dealer in accordance with the usual trade practices initiated by the other broker or dealer within or promptly upon the expiration of a period of 30 calendar days after the settlement date; or

(2) At the option of the trustee by the delivery of the securities against receipt of the contract price or payment of the contract price against the receipt of the securities at any time within 30 calendar days after settlement date unless the commitment previously has been bought-in or sold-out in accordance with paragraph (a)(1) of this section; or

(3) In the event of the refusal of the other broker or dealer to accept completion of an open contractual commitment in accordance with paragraph (a)(2) of this section, or the failure of the other broker or dealer to promptly buy-in or sell-out a commitment in accordance with paragraph (a)(1) of this section, or in the event of the failure of the other broker or dealer to provide the trustee with appropriate documentation as required by § 300.303, by delivery of securities against receipt of the contract price or payment of the contract price against receipt of securities, or the buy-in or sell-out of the commitment or cancellation of

RCM argues that § 300.302(a)(3) is irrelevant because neither it nor Kalin refused to complete the transactions. It contends that under either § 300.302(a)(1) or (a)(2), the Trustee had to deliver the Abbott Labs shares to RCM and its clients within 30 days after the settlement date.

▮ The Closeout Rules apply to nondebtor brokers who, on behalf of their own customers, enter into contracts with a debtor, which contracts have trade and settlement dates within a specified period of time and which the debtor cannot complete due to the commencement of the SIPA proceeding. *See In re Bell & Beckwith*, 821 F.2d 333, 338 (6th Cir.1987). Contrary to RCM's assertion, Kalin is not the "other broker" to the Abbott Labs transaction for SIPA purposes. Kalin is an introducing broker who was party to a clearing agreement with the debtor. An introducing broker is not "another broker-dealer" as contemplated by SIPA. *See Ravis v. Day (In re Investors Security, Corp.)*, 6 B.R. 420, 427 (Bankr.W.D.Pa.1980). The clearing agreement governs the relationship between the debtor and introducing brokers.

> Pursuant to that agreement, [the introducing broker] executed all securities trades for the Debtor's customers, issued confirmations to them, held both cash credit balances and securities for them, and issued periodic account statements to them. [The introducing broker's] actions on behalf of the Debtor pursuant to this arrangement preclude the inter-broker transaction required under SIPA § 6(d).

*Id.* RCM, on behalf of its customers, was Adler Coleman's customer. It is not "another broker or dealer". Therefore, the Closeout Rules are inapplicable and the Trustee was not obligated to complete the Abbott Labs transaction. *See also SEC v. Aberdeen Securities Co.*, 480 F.2d at 1125 ("undertakings involving only the debtor and his customers are not the contractual commitments contemplated by [SIPA], and therefore the Trustee could not be forced to satisfy this claim in kind").

> the commitment or otherwise, as may be appropriate, as the trustee in his discretion believes will most benefit the estate of the debtor.

▮ RCM next contends that the Trustee must deliver it the Abbott Labs stock because the Abbott Labs securities are "customer name securities" which SIPA defines as

> [s]ecurities which were held for the account of a customer on the filing date by or on behalf of the debtor and which on the filing date were registered in the name of the customer, or were in the process of being so registered pursuant to instructions from the debtor...

15 U.S.C. § 78*lll*(3). "Customer name securities" are non-negotiable securities. *Id.; McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 842, 858 (Bankr.N.D.Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir.1991).

RCM concedes that those securities were not registered in the names of the custodian banks on behalf of its customers. Still, RCM contends that the securities are "customer name securities" because it did everything possible to obtain the Abbott Labs securities, to no avail, since ERISA prevented it from closing out the sales and the Trustee refused to cooperate with it.

It is irrelevant that RCM may have been prevented by ERISA from remitting the funds necessary to close out the transaction. In *In re Bell & Beckwith*, 104 B.R. 842, the claimants opened cash accounts with the debtor and instructed that all securities be registered in the owner's name. The claimant purchased United States treasury notes. Debtor's manager allegedly told claimant that treasury notes could not be registered in the owner's name, but assured him that they were safe because they were "earmarked" for the claimant in debtor's records. Although debtor held the notes in a "safekeeping only" or "S.K.O." account, the manager fraudulently hypothecated them using them as collateral to cover other loans. In fact, the notes could have been held in the owner's name. In debtor's SIPA liquidation proceeding, the claimants argued, among other things, that because the manager misled them when they asked him to register the treasury notes in their own names, their

17 C.F.R. § 300.302(a).

instructions should be given effect and the treasury notes should be treated as if they were in the process of being registered. The court rejected this argument, holding that the treasury notes did not meet the statutory definition of customer name securities. *Id.* at 857.

As with the *Bell & Beckwith* claimant, forces beyond RCM's control (i.e. the ERISA legislation) allegedly frustrated its desire to have the Abbott Labs securities registered in the custodian banks' names. RCM cites no reason, and we are aware of none, why the result here should differ from that in *Bell and Beckwith.*

RCM contends the trustee should have made a special accommodation and negotiated an alternative procedure for payment because it could not pay the debit until it received the stock certificates. However, even if ERISA prevented RCM from paying for the shares it is not the Trustee's problem or SIPC's problem, but rather, is one of the risks of entering into this type of transaction. In *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978 (2d Cir.1974), the court stated:

> [A]rguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of [the debtor] would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customer.

*Id.* at 983. RCM has not provided any basis for finding, as a matter of equity, that it is entitled to the net asset value of its securities.

The situation here is similar to that in *In re John Muir*, 28 B.R. 946 (Bankr.S.D.N.Y. 1983). In that case, Templeton, a mutual fund, purchased Jackson National Life ("Insurance Stock") through Muir, who was the market maker in that stock. Templeton's normal procedure was to place a trade order with a broker and, when the trade was completed, to instruct its custodian bank to pay out in exchange for the securities. Templeton placed the order with Muir but failed to inform the custodian bank. Muir tendered the Insurance Stock to the custodian bank's agent, who refused to accept it because there were no instructions from the mutual fund. Templeton subsequently instructed the banks to accept the shares and make payment. However, SIPC filed for liquidation of Muir before the transaction closed. Templeton filed its claim, stating that Muir owed Templeton the Insurance Stock, and that Templeton owed Muir the purchase price of that stock. Templeton argued that it had a right to redeem the shares by payment of the purchase price. The trustee claimed that any right of redemption is limited to sixty days after filing, a deadline then long past. Therefore, the trustee argued, Templeton's allowed claim was limited to its net equity as of the filing date. The court agreed with the trustee, finding that the time limit in SIPA § 78*lll*(11)(C) allows no discretion. It stated that:

> this limit appears to be intended to allow some opportunity for redemption by margin customers while preventing such customers from "playing the market" with the debtor bearing all the risk. That is, to prevent customers from waiting for market developments only redeeming if the market price has gone up.

*Id.* at 949. We find no merit to RCM's contention that *Muir* is distinguishable because that case involved a mutual fund and not an ERISA governed pension fund. The RCM Account was credited with the Abbott Labs securities and was debited by the purchase price, just like any other account. The fact that RCM's transaction never closed because the account was structured to comply with ERISA and the Internal Revenue Code does not create a conflict between ERISA and SIPA. SIPA merely provides a mechanism for calculating how much a customer should be reimbursed for its loss due to a broker-dealer liquidation. The failure to remit payment only determines the amount of recovery. *See* 15 U.S.C. § 78*lll*(11).

The Abbott Labs stock are not customer name securities because they are not registered in the names of the custodian banks and they were not in the process of being so registered by the debtor as of the Filing

Date. We find the Securities Investor Protection Corporation 1981 Annual Report instructive. It notes that:

> One potential problem that exists under the present definition of customer name securities is the requirement that securities being registered in the name of the customer must be in the process of being registered upon instructions from the broker-dealer. Thus, if a customer requests a broker-dealer to register the stock in his or her name and the broker-dealer fails to follow instructions, the customer will not be entitled to the securities. If this situation occurs, the customer could sue the broker-dealer for damages but he would be a general creditor and would not receive favored treatment as a customer having customer name securities.

Securities Investor Protection Corporation, 1981 Annual Report 6 (1982) (quoted in 3C Harold S. Bloomenthal, Securities and Federal Corporate Law § 12.17 (1996)).

■ Moreover, even if the Abbott Labs securities were "customer name securities," under SIPA, the Trustee could condition the delivery of the securities upon payment of amounts owed by the customer to the debtor, as follows:

> The trustee shall deliver customer name securities to or on behalf of a customer of the debtor entitled thereto if the customer is not indebted to the debtor. If the customer is so indebted, such customer may, with the approval of the trustee, reclaim customer name securities upon payment to the trustee, within such period of time as the trustee determines, of all indebtedness of such customer to the debtor.

15 U.S.C. § 78fff–2(c)(2).

■ On or about March 3, 1995, RCM received a memorandum from the NSCC (the "NSCC Memorandum") advising in part, as follows:

> On March 2, 1995, SIPC and the Trustee agreed to permit NSCC to complete all open RVP/DVP transactions with institutional customers of, or carried by, Adler when the contra-side of the transaction is (a) in NSCC's Continuous Net Settlement (CNS) System, (b) one or more other such related ID [Institutional Delivery] open transactions, or (c) a combination of the foregoing.
>
> Institutional customers of, or carried by, Adler will need to complete a single short form release of any claims they might have against Adler with respect to all the open RVP/DVP transactions which are completed. A copy of the release is attached and should be delivered to NSCC, after you have agreed with NSCC as to the RVP/DVP transactions to be completed.
>
> Representatives of NSCC, Adler or correspondents of Adler who executed the transactions will be contacting affected customers or their agents with respect to the specific transactions meeting the criteria described above. NSCC will obtain the approval of SIPC or the Trustee for each specific transaction.

NSCC Memorandum ¶¶ 2–5. By letter dated March 6, 1995, RCM waived any and all claims actually known to it as of March 6, 1995 that it may have had against debtor arising out of the purchase of the Abbott Lab securities. Neither RCM nor Kalin received a response from the Trustee. RCM asserts that from March 7, 1995 to March 20, 1995, Kalin repeatedly advised it that NSCC, on Trustee's behalf, was processing the debtor's open Abbott Labs DVP transactions. RCM contends that had the Trustee or NSCC responded to its letter, it would have instructed the custodian bank acting on behalf of RCM's customers to remit the purchase price for the Abbott Labs stock against delivery of the stock. This is another reason why RCM contends that it is entitled to recover the securities or their value.

The Trustee is correct that the NSCC Memorandum does not guarantee completion of all open transactions and neither NSCC nor the Trustee has a duty to do so under law. The NSCC Memorandum states that the NSCC would close out trades only where it could "match" open sells and open buys with the appropriate contra-side. In this particular case, no match was found. The fact that RCM requested the Trustee to complete the transactions did not compel the Trustee to do so. Moreover, that Kalin, as RCM's agent, misinformed RCM about the

status of the transactions has nothing to do with the Trustee's or the NSCC's actions in this case. In any event, RCM could have protected itself by covering the transactions. Then, RCM would have had the benefit of the rise in market value of the Abbott Labs stock and if the price went down, RCM could have canceled the transaction. RCM argues that it could not have covered because it relied on NSCC's advice, as late as March 21, that the transactions would be completed and that the first RCM heard to the contrary was in February, 1996. We are unpersuaded by this excuse because RCM had no right to rely on the NSCC Memorandum and has not shown such reliance. The claim form indicated that RCM was to remit payment for the Abbott Labs securities before a specified date and RCM failed to do so.

Next RCM contends that it should recover the difference between the purchase price of the Abbott Labs shares and its sale price because its clients wanted to complete the transactions within the time specified by the claim form but the Trustee refused to reach an agreement with them which would permit them to do so legally and under the terms of their DVP accounts.

 Upon commencement of the SIPA liquidation proceeding, RCM no longer had a right to the securities in its accounts, but rather, RCM had a claim against a fund of customer property, including the securities in its accounts, to be distributed to customers based upon their respective net equity pursuant to SIPA §§ 78fff–2(c)(1)[5], 78lll(4)[6], (11). SIPC may not advance funds for claims against the broker that do not fall within the narrow scope of a customer's net equity claim. 15 U.S.C. § 78fff–3(a); 17 C.F.R. Part 300.300. See also In re Adler Coleman, 195 B.R. at 273. As explained in Bell & Beckwith:

> [a]fter receipt of a written statement of claim pursuant to subsection (a)(2), of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer ... insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date.

104 B.R. at 855. Thus, RCM cannot recover for market losses suffered during the pen-

---

**5.** (c) Customer related property

The trustee shall allocate customer property of the debtor as follows:

(A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff–3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;

(B) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

(C) third, to SIPC as subrogee for the claims of customers;

(D) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff–3(c)(2) of this title.

15 U.S.C. § 78fff–2(c)(1).

**6.** (4) Customer property

The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes—

(a) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on securities of the same class and series of an issuer is attributable to the debtor's noncompliance with the requirements of section 78o(c)(3) of this title and the rules prescribed under such section;

(B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;

(C) any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title; and

(D) any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

Id. § 78lll(4).

dency of this SIPA liquidation proceeding. *See* 15 U.S.C. § 78*lll*(11); *SEC v. Albert & Maguire Securities Co., Inc.*, 560 F.2d 569, 572 (3d Cir.1977) (SIPA does not protect against market fluctuation); *SEC v. Aberdeen Securities Co., Inc.*, 480 F.2d at 1124 n. 3 ("The change of values between filing date and the time when the claim is paid is a problem for legislative, not judicial, solution. It should be remembered that before SIPC, customers of troubled brokerage houses might not have realized anything at all on their claims."); *Matter of Bevill, Bresler & Schulman, Inc.*, 83 B.R. at 892 ("By use of a uniform filing date, SIPA is designed to insulate the calculation of net equity claims and distributions made on the basis thereof from market fluctuation."). Moreover, SIPA § 78fff–2(f) places the decision to release customer property prior to a final distribution within the Trustee's and SIPC's sole discretion. 15 U.S.C. § 78fff–2(f).[7] *See also In re Adler, Coleman Clearing Corp.*, 195 B.R. 266 (where the claimant contended that his loss was compounded by the trustee's failure to timely transfer his account and that the loss was recoverable as a SIPA customer claim, the fact that stock of the same type as in his account was being distributed to other claimants was irrelevant because the trustee was vested with control over the customer accounts maintained by the debtor, not the securities contained therein); *In re Weis Sec.. Inc.*, 3 B.C.D. 88 (S.D.N.Y.1977) (where a customer sought recovery for market losses incurred during a SIPA liquidation when a tender offer was made for shares in a corporation and the trustee failed to respond to the customer's instruction to tender the shares, the court found that the trustee discharged his duty appropriately by distributing to the customer his pro rata share of the securities which were specifically identifiable property, stating that "[t]he trustee's role is not that of a substitute broker"). The Trustee did not abuse his discretion in failing to reaching an agreement to pay out the securities to RCM, as such an agreement would not serve the Trustee's duty to protect customers against loss of securities and cash in their accounts and to maintain the integrity of the brokerage community. *Weis*, 3 B.C.D. at 89.

### Conclusion

We uphold the Trustee's determination regarding RCM's claim.

SETTLE ORDER.

---

7. That section provides:

(f) Transfer of customer accounts
 In order to facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor, the trustee may, pursuant to terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer of the debtor. In connection with any such sale or transfer to another member of SIPC and subject to the prior approval of SIPC, the trustee may—
 (1) waive or modify the need to file a written statement of claim pursuant to subsection (a)(2) of this section; and

 (2) enter into such agreements as the trustee considers appropriate under the circumstances to indemnify any such member of SIPC against shortages of cash or securities in the customer accounts sold or transferred.
 The funds of SIPC may be made available to guarantee or secure any indemnification under paragraph (2). The prior approval of SIPC to such indemnification shall be conditioned, among such other standards as SIPC may determine, upon a determination by SIPC that the probable cost of any such indemnification can reasonably be expected not to exceed the cost to SIPC of proceeding under section 78fff–3(a) of this title and section 78fff–3(b) of this title.
15 U.S.C. § 78fff–2(f).