**In re FIRST STATE SECURITIES CORP., Debtor.**

**Bankruptcy No. 81–01207–BKC–TCB.**

United States Bankruptcy Court, S.D. Florida.

Oct. 25, 1983.

John L. Britton, Fort Lauderdale, Fla., trustee.

Steven Friedman, Miami, Fla., for trustee.

Jim D. Syprett, Donald J. Harrell, Sarasota, Fla., for claimants.

## ORDER ON CLAIMS 802 THROUGH 806

THOMAS C. BRITTON, Bankruptcy Judge.

The trustee's objections to claims 802 through 806 were heard on September 1. The debtor is an insolvent securities broker that is in this court under SIPA, the Securities Investor Protection Act of 1970, 15 U.S.C. § 78eee(b)(4).

Early in this case, the trustee persuaded me to enter a misleading and inappropriate order requiring all claims to be filed with him rather than this court and imposing an involuted claims procedure. These claims were presented as specified in that order. That procedure, said to be customary in SIPA cases, suggests that claims are presumed invalid unless documented to the satisfaction of SIPC, the Securities Investor Protection Corporation.

SIPA stipulates that:

"To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." § 78fff(b).

There is nothing in SIPA inconsistent with bankruptcy claims procedure. Notwithstanding the earlier order, therefore, the claims in this case are prima facie evidence of the validity and amount of the claims. 11 U.S.C. § 502(a); B.R. 3001(f).

SIPA provides what amounts to limited insurance protection for the customers of brokers that become insolvent. Reimbursement is funded from assessments on all brokers and is administered by SIPC. The assessments are ultimately borne, of course, by the customers. In these cases generally and in this case, the debtor's assets are insufficient to meet all claims, therefore, the major issue here is whether these claims are within SIPA coverage and are payable by SIPC.

The pertinent facts, which are not in significant dispute, are essentially similar with respect to all five claims. Each of the claimants had a cash brokerage account with the debtor. Each was serviced by the same individual.

The debtor did not have the resources to provide margin accounts for its customers, therefore, at least seven months before July 24, 1981, the date of this proceeding, the debtor opened margin accounts for each claimant with another broker, A.G. Becker, Inc. There was no other connection between the debtor and Becker.

All transactions in the margin accounts were effected on the debtor's orders. The debtor could and did, therefore, buy and sell securities in each claimant's margin account (as well as in the cash account), borrow funds on the claimant's margin and move funds between the two accounts. These claims arise because the debtor did so without authorization.

Since 1976, the debtor (through its principals, including the individual who serviced these accounts) had fraudulently manipulated certain over-the-counter stocks and sold them at fraudulently inflated prices. The transactions involved in these claims occurred between December 1980 and July 1981. The unauthorized purchases made by the debtor for these claimants in their cash accounts all involved Osrow stock. The unauthorized purchases in their margin accounts all involved Bunnington stock. These were two of the manipulated stocks. These purchases were funded either with cash from one of the accounts, funds borrowed on margin, the unauthorized sale of stock in one of the accounts, or a combination of these sources.

*Customer status.*

Each of these claims except 806 includes a claim for unauthorized purchase. The trustee (presumably on behalf of SIPC) has denied that these claims (as asserted in 803 and 805) are within SIPA coverage because the loss involved an account with another broker. I disagree.

It is not suggested that the other broker, Becker, was in any way responsible for the loss. The argument is that claimants are not the debtor's "customers" as that term is defined by SIPA, 15 U.S.C. § 78*lll*(2):

> "*The term 'customer' of a debtor means any person* (including any person with whom the debtor deals as principal or agent) *who has a claim on account of securities* received, *acquired,* or held *by the debtor in the ordinary course of its business as a broker* or dealer from or *for the securities accounts of such person* for safekeeping, with a view to sale to cover consummated sales, *pursuant to purchases,* as collateral security, or for purposes of effecting transfer. The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities ..."

These claimants clearly fall within the underscored provisions of the statutory definition. Furthermore, the Becker margin accounts were opened by the debtor to fill a void in the ordinary course of its business and were used as though they were accounts with the debtor to further its own fraudulent purposes as much as to serve the needs of its customers.

The loss would certainly be covered had the services of Becker not been used. *SEC & SIPC v. Harold Lawrence & Co.,* 4 CBC 1, 8 (Bkrtcy.S.D.N.Y.1975); *SEC v. S.J. Salmon & Co. Inc.,* 375 F.Supp. 867, 871 (S.D.N.Y.1974). There is nothing in SIPA which suggests that coverage should be de-

nied merely because the debtor used the facilities of another innocent broker in converting its customer's property. SIPA is remedial legislation. As such it should be construed liberally to effect its purpose. *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The purpose is the protection of the insolvent brokers' customers. *SEC v. Ambassador Church Finance/Development Group, Inc.,* 679 F.2d 608, 612 (6th Cir.1982). This defense is without merit.

### Ratification.

■ The trustee has also argued (on behalf of the estate as well as on SIPC's behalf) that the unauthorized purchases were ratified by the claimants' acquiescence after receipt, in each instance, of a confirmation notice and account statement reflecting the unauthorized transaction. Again, I disagree. I find that in each instance the claimant made one or more reasonably prompt written as well as oral protests, all of which were ignored by the debtor.

■ The trustee also argues that the claimants' correspondence of May 1981 constituted ratification. This correspondence, however, is nothing more than claimants' attempt to salvage something from the debtor's unauthorized conversion of their property after they had unsuccessfully demanded an accounting and the return of their property.

■ The defense of ratification must fail for an additional reason. It is an affirmative defense which the trustee has the burden of establishing. Florida law controls here as to whether he has carried that burden. As stated in *Bach v. Florida State Board of Dentistry,* 378 So.2d 34, 36–37 (Fla. 1st DCA 1979):

"Before one may infer that a principal ratified an unauthorized act of his agent, the evidence must demonstrate that the principal was *fully informed* and that he approved of the act. . . . The principal 'has a right to presume that his agent has followed instructions, and has not exceeded his authority.' . . . And, 'whenever he

is sought to be held liable on the ground of ratification, either express or implied, it must be shown that he ratified upon full knowledge of all material facts, or that he was willfully ignorant, or purposely refrained from seeking information, or that he intended to adopt the unauthorized act at all events, under whatever circumstances.' "

Not surprisingly, the debtor's fraudulent manipulation of the stocks it purchased without authorization was never disclosed to the claimants. I find that the fraudulent manipulation was a material fact not known to the claimant. Without that knowledge, claimants cannot be said to have ratified the unauthorized purchases even if they had never protested. This defense is also without merit.

### Failure to execute sell orders.

■ Claims 803, 805 and 806 include claims for failure by the debtor to execute an order to sell securities for the account of the claimant. The trustee (again on behalf of SIPC) has denied that these claims are within the SIPA coverage. I agree. As was held in *SEC & SIPC v. Harold Lawrence & Co.,* 4 CBC 1, 6 (Bkrtcy.S.D.N.Y. 1975).

"The Act is designed to remedy situations where the loss arises directly from the insolvency of the broker-dealer. Customers are protected from funds or securities lost as a result of the liquidation of the broker. It does not apply to the case where the loss arises from a breach of contract. The failure to comply with a sell order does not result from the insolvency, but rather gives rise to a cause of action for breach of contract."

■ Claimants argue that the failure to sell amounted to a conversion because it benefitted the debtor's market manipulation. I do not follow this contention. Generally some affirmative act is essential to conversion; nonfeasance does not suffice. *SEC v. JNT Investors, Inc.,* ¶ 96,729 Fed. Sec.L.Rep. (CCH) (Bkrtcy.S.D.N.Y.1978);

*see* Restatement (Second) of Torts, § 224 (1965).

It is conceded that the claims for failure to execute sell orders are allowable as general unsecured claims against the debtor's non-customer assets. The amounts of these claims are disputed and will be discussed below.

### Interest.

■ In 803, 805 and 806 claimants claim interest charged them by Becker for margin advances. The margin account contracts provide a floating interest rate. The actual charges made by Becker during the period involved here varied from 15.5% to 22.75%. Although the trustee has not specifically questioned the interest charges, the claimant's evidence makes it clear that they calculated the interest loss at a flat rate of 18%.

Furthermore, the interest claimed in 805 and 806 is extended to various dates, all beyond the date of this proceeding, July 24, 1981. Interest does not accrue in bankruptcy beyond the date of the proceeding. 11 U.S.C. § 502(b)(2). For these reasons, the prima facie validity of this aspect of these claims collapses. The burden is on the claimants to prove the amount of their claims. *Cf., Matter of Van Dyk Research Corp.,* 13 B.R. 487 (Bkrtcy.D.N.J.1981). They have not done so with respect to their interest claims.

With the foregoing general comments, findings and conclusions in mind, we turn next to a specific analysis of each claim.

### Claim No. 802.

■ This claim for $69,375, filed by H.F. Alward, contains two elements. It includes a claim for $28,125 transferred by the debtor without authority from his cash account to his margin account on May 13, 1981. Two weeks later, $24,000 of that sum was transferred back to his cash account, therefore, we are actually concerned with only $4,125. That sum was fully credited to Alward against the balance owed by him to Becker on his margin account. The margin account was authorized by Alward and the

obligation to Becker is not disputed. I find, therefore, that Alward has sustained no loss as a result of the unauthorized transfer of this money from one of his accounts to another. This element of this claim is denied.

■ The rest of the claim, $41,250, is for the unauthorized purchase on February 10, 1981, of Osrow stock for his cash account. The purchase was funded in part by the liquidation of some stock in his margin account and the balance was borrowed on the margin account from Becker. The sole defense to this element of the claim is ratification. Alward protested orally and in writing within 30 days after receiving the confirmation notice and monthly statement reflecting this purchase. He again protested in writing the following month and made every reasonable effort to undo the damage. For the reasons discussed above, I find that the unauthorized purchase was never ratified by Alward.

Alward is indebted to the debtor in the amount of $5,384 which must be offset against this claim, leaving a balance of $35,866. That sum is allowed as a claim covered by SIPA. The trustee holds the Osrow stock. Claimant has no further interest in that stock. The rest of Claim No. 802 is denied.

### Claim No. 803.

■ This claim for $252,212, also filed by Alward, has two elements. One element, in the amount of $128,754 is for the debtor's failure to execute a sell order on April 30, 1981 of Aerosonic stock from his margin account. This sum includes $5,004 interest. For the reasons stated above, the interest claim is denied. Alward ultimately received $32,450 from the sale of this stock. This leaves a net loss of $91,300. For the reasons stated above, this loss is not covered by SIPA. It is allowed as a general, unsecured claim.

■ The remaining element of the claim in the amount of $123,458, is for the three unauthorized purchases of Bunnington stock in the margin account between De-

cember 10, 1980 and April 30, 1981. These purchases were funded with $24,770 cash transferred from the cash account and with credit extended to him on his margin account by Becker. This element of the claim includes $8,708 interest which is disallowed for the reasons discussed above. Alward received $35,695 from the sale of the stock in question, leaving a net loss of $79,055. This sum is allowed and is fully covered by SIPA.

Claim No. 803 is allowed, therefore, in the total sum of $170,355 ($79,055 of which is covered by SIPA). The balance of the claim is denied.

### Claim No. 804.

This claim in the amount of $55,625, filed by Alward as trustee, contains two elements. One element is for $300 cash transferred by the debtor from the cash account to the margin account on July 15, 1981, perhaps without authorization. Whether or not authorized, both accounts were in his name as trustee and he received full credit in that sum against his outstanding balance owed to Becker. The trust, therefore, sustained no loss. This element of the claim is, therefore, denied.

The remaining element, in the amount of $55,325, is for three unauthorized purchases of Osrow stock made in the cash account between February 10 and June 16, 1981. They were funded with money borrowed on this claimant's margin account. The defense is ratification. It is rejected for the reasons discussed above.

Some of the Osrow stock was sold on July 13, 1981 for $4,250, and credited to the claimant, leaving a net loss of $51,075. This claim is allowed and is entirely covered by SIPA. The trustee holds the remaining Osrow stock. Claimant has no further interest in this remaining stock.

Claim No. 804 is allowed, therefore, in the amount of $51,075, all of which is covered by SIPA. The balance of the claim is denied.

### Claim No. 805.

This claim in the amount of $216,107, also filed by Alward as trustee, contains two elements. One, in the amount of $147,521, is for the debtor's failure to execute a sell order on April 30, 1981 of two stocks from the margin account. This claim includes $12,334 interest which is denied for the reasons discussed above. The claimant ultimately salvaged $34,945 from the sale of the stock leaving a net loss of $100,242, no part of which is covered by SIPA. It is allowed as a general, unsecured claim.

The balance of the claim in the sum of $68,586 is for two unauthorized purchases of Bunnington stock on December 10, 1980 and June 3, 1981 in the margin account. This element of the claim includes $6,711 interest which is denied for the reasons stated above. The trustee has argued ratification and that claimant is not a "customer" of the debtor. For the reasons discussed above, each of these defenses is rejected. The claimant ultimately salvaged $13,723 from the sale of the stock and, therefore, sustained a net loss of $48,152 which is allowed and all of which is covered by SIPA.

Claim No. 805, therefore, is allowed in the total amount of $148,395 ($48,152 of which is covered by SIPA). The rest of the claim is denied.

### Claim No. 806.

This claim of $44,017 is filed by W. Mann and his wife for the debtor's failure to execute a sell order from their margin account on July 15, 1981. The claim includes $817 interest which is denied. Claimants eventually salvaged $11,682 from the sale of the stock in question, leaving a net loss to them of $31,518. The claim is allowed in this amount, no part of which is covered by SIPA. The rest of the claim is denied.

### Maximum SIPA Coverage.

SIPA provides a maximum coverage "not to exceed $500,000 for each customer". This sum is not exceeded by any customer

in this case. However, SIPA further provides that if the claim "of a customer":

"is a claim for cash, as distinct from a claim for securities, the amount advanced to satisfy such claim for cash shall not exceed $100,000 for each such customer." § 78fff3(a)(1).

Alward and Alward as a trustee are two separate customers for the purposes of the foregoing provision. § 78fff–3(a)(2). The total amount allowed Alward as trustee within SIPA coverage is $99,227. The foregoing provision has no effect, therefore, upon his claims as trustee.

The total allowed Alward as an individual within SIPA coverage, however, is $114,921. The question, therefore, is whether these are claims "for cash as distinct from a claim for securities". I conclude they are "for cash" and, therefore, the SIPC liability for reimbursement to Alward as an individual is limited to $100,000. The rest of his claim, $14,921, is allowed as a general, unsecured claim.

The trustee, Mr. Britton, and his counsel, Mr. Friedman, are requested to appear at 9:30 a.m. on November 7, 1983, in Courtroom 1406, 51 S.W. 1 Avenue, Miami, Florida, for a status conference with respect to this case. At that hearing, the court will also consider any motion for rehearing filed by any party addressed to the foregoing order.