**In re STRATTON OAKMONT, INC., Debtor.**

**Securities Investor Protection Corporation, Plaintiff,**

**v.**

**Stratton Oakmont, Inc., Defendant.**

**No. 97–40501 ALG.**

United States District Court, S.D. New York.

Jan. 24, 2001.

Weil, Gotshal & Manges, LLP, New York City, Steven Alan Reiss, Adam C. Rogoff, Theodore E. Tsekerides, Gary Ticoll, of Counsel, for Harvey R. Miller, as Trustee for Stratton Oakmont, Inc., Debtor.

Securities Investor Protection Corporation, Washington, D.C., Stephen P. Harbeck, Josephine Wang, of Counsel.

Maddox, Koeller, Hargett & Caruso, Indianapolis, IN, New York City, Thomas Hargett, Steven B. Caruso, of Counsel, for Claimants Richard C. Heidal, Ousama L. Nimri and Jean Wiseman.

Timothy J. Dennin, P.C., New York City, Timothy J. Dennin, of Counsel, for Claimants Louis E. Dequine Revocable Trust and Dorothy M. Dequine Revocable Trust.

Emmett N. O'Hare, Ewing, NJ, Claimant Pro Se.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

Stratton Oakmont, Inc. ("Stratton Oakmont") was a securities broker-dealer and a member of the National Association of Securities Dealers ("NASD") and the Securities Investor Protection Corporation ("SIPC"). After Stratton Oakmont was expelled from the NASD for a pattern of wilful disregard of regulatory requirements, it ceased doing business and filed a petition under Chapter 11 of the Bankruptcy Code in this Court. On January 27, 1997, SIPC filed a complaint in the District Court seeking entry of a protective decree adjudicating that the customers of Stratton Oakmont were in need of protection, and two days later the District Court entered an order that, among other things, placed Stratton Oakmont in liquidation under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), appointed Harvey R. Miller, Esq. as Trustee (the "Trustee") for the purpose of liquidating its business, and removed the SIPA liquidation proceedings to this Court pursuant to § 78eee(b)(4) of SIPA.

In the course of the liquidation proceeding, the Trustee established a bar date requiring that all entities file claims against Stratton Oakmont or be forever precluded from recovery from the estate. In February 1997, approximately 22,000 claim forms were sent to prospective parties in interest, along with a notice of the commencement of the SIPA Proceeding, a brochure about SIPC and instructions on how to complete the claim form seeking "customer" status. Approximately 3,300 "customer" claims were filed. Some of these claims were the subject of previous motions before this Court. See *SIPC v. Stratton Oakmont, Inc.,* 229 B.R. 273 (Bankr.S.D.N.Y.1999), *aff'd with opinion, Arford v. Miller,* 239 B.R. 698 (S.D.N.Y. 1999), *aff'd,* 210 F.3d 420 (2d Cir.2000), which also provides a more comprehensive account of the reasons for Stratton's filing and the background to these proceedings.

In the instant matter the Trustee has moved for an order upholding his determinations with respect to six claims filed against Stratton Oakmont in the liquidation proceedings and expunging objections with respect to such determinations. The six Claimants are all former investors with Stratton Oakmont and assert claims based on unauthorized trading in their accounts. Although five of the six Claimants are unrelated, the Trustee has grouped their claims together as they raise, in essence, one common issue of law, namely, the nature of the recovery provided for under SIPA when a customer has been the victim of the broker's multiple wrongs, including both the unauthorized purchase and the unauthorized sale of stock.

Although the facts related to the claims are complex, there do not appear to be any material facts in dispute. Most important, each of the Claimants has met the Trustee's stringent requirements as to proof that unauthorized trading occurred in the customer's account—for example, by having asserted and documented claims for unauthorized transactions long before the broker failed. Nor is there a dispute as to the identity of the securities that were the subject of the unauthorized trading. The specific facts that gave rise to the Trustee's determinations and the instant dispute are the following.

*Emmett N. O'Hare*

O'Hare opened an account with Stratton Oakmont in September of 1994. On September 27, 1994, Stratton Oakmont purchased 200 shares of United States Surgical Corp. ("US Surgical") at $25.00 per share with his authorization. On October 6, 1994, O'Hare's broker at Stratton Oakmont telephoned him and recommended that he buy 2000 shares of Select Media Communications ("Select Media") stock at $7.50 per share. O'Hare wanted to purchase Select Media, but lacked the funds on hand to do so and did not want to make the purchase on margin. O'Hare stated that he would get the initial payment to the broker immediately and would pay the balance within 30 days; the broker claimed that the U.S. Surgical shares would rise in price and cover the purchase.

On October 14, 1994, 2000 shares of Select Media were purchased for him by Stratton Oakmont. The purchase was paid in part by the proceeds of the sale of U.S. Surgical, which O'Hare had authorized, and in part on margin. O'Hare believed that the balance of the proceeds of U.S. Surgical, not required for the purchase of Select Media, would be deposited in his cash account. The month-end account statement, however, reflected that the shares of Select Media were sold on November 1, 1994, for a substantial loss and that the proceeds had been used to buy a stock called Dollar Time Group ("Dollar Time"). Neither the sale nor the purchase had been authorized by O'Hare.

The Trustee made the following findings and determination with respect to the

O'Hare claim. He found that on or about November 8, 1994, Stratton Oakmont made an unauthorized purchase of 12,000 shares of Dollar Time stock for $13,885.00, using almost all of the proceeds of the unauthorized sale of 2,000 shares of Select Media for $13,990.00. The Trustee determined that O'Hare would be returned to his "original position," in that 2000 shares of Select Media would be delivered to him upon the "return" of the shares of Dollar Time.[1]

*Louis E. Dequine, Jr. Revocable Trust and Dorothy M. Dequine Revocable Trust*

The Dequines appear to have asserted claims based on unauthorized transactions in three accounts maintained with Stratton Oakmont. However, only the determinations by the Trustee with respect to the Dequines' Trust accounts are contained in the record and will be considered here.[2]

On or about November 11, 1994, Stratton Oakmont recommended the sale of all securities maintained in both Trust accounts and the use of the proceeds to purchase Solomon Page Group, Ltd. ("Solomon Page"). The Claimants objected to the recommendation. On or about November 17, 1994, nevertheless, Stratton Oakmont sold the securities held in both accounts and with the proceeds purchased (i) 40,000 shares of Solomon Page in the Louis E. Dequine, Jr. Trust account and (ii) 15,000 shares of Solomon Page in the Dorothy M. Dequine Trust account. Upon the later transfer of the trust accounts to Paine Webber, the 40,000 shares of Solomon Page in the Louis E. Dequine, Jr. Trust account and the 15,000 shares of

---

1. There does not appear to be any dispute that the shares of Select Media have no current value and were substantially worthless on the SIPA Filing Date. As a result of two reverse splits the 12,000 shares of Dollar Time have been reduced to 600 shares and also appear to be of little value.

2. The record contains customer claim forms and determinations by the Trustee with respect to claims by the Louis E. Dequine, Jr. Revocable Trust and the Dorothy M. Dequine Revocable Trust. The record does not con-

tain a customer claim form or a determination by the Trustee for the individual account held in the name of Louis E. Dequine, and any claim by Dequine personally is not dealt with herein. The Trusts also rely on arbitration proceedings before the NASD and a settlement agreement for $183,385.00 between the claimants and Stratton Oakmont. As further discussed below, the agreement does not afford the Trusts any rights to customer status or to the relief they seek.

Solomon Page in the Dorothy M. Dequine Trust account were sold.

Customer claim forms were filed on behalf of the Trusts in the liquidation asserting that Stratton Oakmont owed the Louis E. Dequine, Jr. Trust $202,921.40 and the Dorothy M. Dequine Trust $45,288.80, respectively, each amount being the difference between the amounts invested and the gross proceeds of the sale of Solomon Page.

With respect to the Louis E. Dequine, Jr. Trust, the Trustee determined that on or about November 17, 1994, Stratton Oakmont sold 36,667 shares of Select Media for a total of $279,575.88, without authorization. On or about November 17, 1994, Stratton Oakmont purchased a total of 40,-000 shares of Solomon Page stock for $270,010.00, without authorization. In addition, a balance of $9,565.88 in cash was paid to the Trust as a result of the transactions. The Trustee advised the Claimant that, upon the "return" of $9,565.88 in cash and 40,000 shares of Solomon Page, the Trustee would deliver to the claimant 36,-667 shares of Select Media.

With respect to the Dorothy M. Dequine Trust, the Trustee determined that on or about November 17, 1994, Stratton Oakmont sold 13,333 shares of Select Media for $101,654.13 and purchased 15,000 shares of Solomon Page for $101,260.00, without authorization. As a result of this transaction a balance of $394.13 was paid to the Trust in cash. The Trustee advised the Claimant that, upon the "return" of $394.13 in cash and 15,000 shares of Solomon Page, the Trustee would deliver to the Claimant 13,333 shares of Select Media.

*Richard C. Heidal*

Heidal opened an account with Stratton Oakmont in March of 1994. On or about October 6, 1994, Heidal authorized the purchase of 6,500 shares of Select Media. He claimed that on or about November 7, 1994, Stratton sold the Select Media shares, without authorization, and purchased 7,000 shares of Solomon Page at $7.00 per share (for a total of $49,010.00), also without authorization. This unauthorized transaction resulted in a loss of $38,903.37 when the Solomon Page shares were eventually sold. Heidal filed a customer claim form claiming he was due a balance of $38,903.00 and no securities.

The Trustee found that on or about October 20, 1994, Heidal's account held 6,500 shares of Select Media and a credit balance of $417.88. On or about November 15, 1994, Stratton Oakmont sold 6,500 shares of Select Media for $49,958.75 and purchased 7,000 shares of Solomon Page for $49,010.00, without authorization. On or about January 17, 1995, a check for $1,366.63 was sent to Heidal, which represented the proceeds of the unauthorized transaction, $948.75, and the credit balance, $417.88. Thereafter, Solomon Page was sold for $8,740.00, and Heidal was sent a check for that amount. The Trustee determined that he would "reverse each such transaction" and that, upon the "return" of the cash proceeds received by Heidal, totaling $10,106.63, Heidal would be restored to his "original position" of 6500 shares of Select Media stock and a credit balance of $417.88.

*Ousama L. Nimri*

On or about September 2, 1994, Nimri authorized the purchase of 2,000 shares of Select Media at $6.75 per share. He claimed that on or about September 22, 1994, 1,000 additional shares of Select Media were purchased at $7.125 per share for a total of $7,125.00, without authorization. On or about October 19, 1994, Nimri received a confirmation statement disclosing that 2000 shares of Select Media had been sold at $7.00 per share (without authorization) and that 2,100 shares of Octagon were purchased for $13,397.50, again without authorization. He submitted a customer claim form claiming a credit balance of $12,009.00, which was the loss he alleges he suffered when the Octagon shares declined precipitously in value.

The Trustee determined that on or about November 9, 1994, 2,000 shares of Select Media were sold for $13,990.00 and 2,100 shares of Octagon were purchased for $13,397.50, both without authorization. He further determined that Nimri received $592.50 in cash, representing the difference in price between the unauthorized sale and purchase, and that thereafter, Octagon declared a cash distribution at a rate of $.0502 per share and had a closing price on the Filing Date of the SIPA proceeding of $.18 per share. He stated that, upon the "return" of $970.50 in cash ($592.50, representing the proceeds of the unauthorized transaction, and $378.00, representing the Filing Date value of the shares of Octagon), the Trustee would "restore" Nimri "to the position he was in immediately prior to the execution of such unauthorized transactions," *i.e.*, by transmitting to Nimri 2,000 shares of Select Media.

*Jean Wiseman*

Jean Wiseman's claim was based on her initial investment of $25,000. Wiseman asserted that Stratton Oakmont had engaged in a series of unauthorized transactions in her account which began in February of 1991, encompassing purchases and sales of shares and warrants of DVI Financial Corporation, Ventura Motion Picture Group, Ventura Entertainment Group and Nova Capital, Inc., all without authorization. At the conclusion of these unauthorized transactions in May 1991, Wiseman's account held 1,900 warrants in DVI Financial Corporation and 100 shares of Ventura Motion Picture Group. The DVI Financial Corporation warrants were sold in 1996, at their expiration, for $197.65, and the Ventura Motion Picture Group stock was asserted to be worthless. Wiseman asserted a customer claim for approximately $25,000.00, representing her initial investment, less the proceeds of the sale of DVI Financial Corporation ($197.65).

The Trustee determined that the following unauthorized transactions occurred in the account of the claimant: on or about February 13, 1991, 2,800 shares of Ventura Motion Picture Group were purchased for $14,710.00 and 2,000 shares of Ventura Entertainment Group were sold for $14,490.00; on or about February 20, 1991, 800 shares of Nova Capital Inc. were purchased for $5,610.00 and 1,100 shares of Ventura Motion Picture Group, Ltd. were sold for $5,490.00; on or about March 13, 1991, 800 shares of Nova Capital Inc. were sold for $6,090.00; on or about March 26, 1991, 1,600 shares of Ventura Motion Picture Group, Ltd. were sold for $7,590.00; on or about March 27, 1991, 1,550 shares of Nova Capital Inc. were purchased for $13,960.00; on or about April 25, 1991, 1,000 shares of DVI Financial Corp. were purchased for $13,260.00 and 1,550 shares of Nova Capital Inc. were sold for $14,327.50; on or about May 10, 1991, 1,000 shares of DVI Financial Corp. were sold for $11,240.00 and 1,300 shares of Nova Capital Inc. were purchased for $11,222.50; and on or about May 24, 1991, 1,900 warrants of DVI Financial Corp. were purchased for $10,460.00 and 1,300 shares of Nova Capital Inc. were sold for $10,065.00.

Additionally, the Trustee determined that the warrants of DVI Financial Corp. expired on February 6, 1996, and that the claimant received $70.00 in net proceeds from the unauthorized transactions. The Trustee's position was that upon the "return" of 100 shares of Ventura Motion Picture Group, Ltd. and $70.00, the Trustee would restore Wiseman to her "original position" of 2,000 shares of Ventura Entertainment Group, Ltd.

The common thread through all of the determinations is the following. The Trustee determined that the Claimant's account "had to be restored" to its position prior to all of the unauthorized transactions. In the words of the Trustee's determination with respect to the Nimri claim, "the Trustee is required to return your account to its status quo ante as if the unauthorized transactions had not occurred." In each case, the Trustee proposed to do so by providing the Claimant

with stock which is currently of virtually no value and was of no value on the Filing Date. The secondary part of the Trustee's determination was that in each case the Claimant had to pay over in kind any cash proceeds that the Claimant received, either from subsequent sale of the stock that had been purchased without authority, from the initial unauthorized sale of stock, or from other source. The result of this prong of the Trustee's analysis is that a several of the Claimants were required to pay over to the Trustee cash of a much higher value than the securities that the Trustee proposed to transmit; Heidal, for example, had to pay the Trustee cash of $10,106.63 and was offered stock of virtually no value.

The question for determination by the Court is whether SIPA requires these results.

*The Securities Investor Protection Act of 1970*

The Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), was enacted in response to the failure of many brokerage firms during the financial crisis of 1969–1970. The purpose of SIPA is set out in the preamble to the statute, which states that the Act is designed "to provide greater protection for customers of registered brokers and dealers." "Customer" is a defined term under the Act and, as further discussed *infra,* does not include all entities with claims against the broker. The Securities Investor Protection Corporation ("SIPC") was established under SIPA "as a nonprofit membership corporation for the purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit." *SPIC v. Barbour,* 421 U.S. 412, 413, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *see also SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 980 (2d Cir.1974). SIPC's members include most interstate broker-dealers, who pay assessments toward a fund that is available to pay certain claims of "customers" of failed broker-

dealers when the broker's assets are inadequate to meet those claims. 15 U.S.C. §§ 78ccc(a)(1) and (2), 78ddd. If SIPC's funds should become inadequate, SIPC can borrow up to $1 billion from the U.S. Treasury. §§ 78ddd(f), (g), (h). SIPC may advance to the trustee of a liquidated broker-dealer, in order to satisfy the "net equity claims" of "customers," not more than $500,000 per customer, of which no more than $100,000 may be used to satisfy that portion of a claim which is for cash rather than for securities. § 78fff-3(a). Each "customer" with a valid claim is assured of satisfaction from funds provided by SIPC within these limits. General creditors of the broker-dealer, customers with claims not satisfied by the broker-dealer or SIPC, and those who do not qualify as customers share on a *pro rata* basis any property available in the estate of the liquidated broker-dealer along with SIPC, which is subrogated to the customer claims that it satisfies. §§ 78fff-3(a), 78fff-2(c)(1).

SIPA also establishes procedures for the liquidation of failed broker-dealers, including specific procedures for the selection of a trustee and counsel under § 78eee(b)(3), the mailing of notices to customers and other creditors under § 78fff-2(a)(1), and the time period for filing claims under § 78fff-2(a)(3). Nevertheless, as stated by SIPC in its memorandum on these motions, "Notwithstanding the special protection afforded customers, a SIPA proceeding basically is a bankruptcy liquidation." SIPC Memorandum at 7, citing SIPA § 78fff(a); *Exchange National Bank of Chicago v. Wyatt,* 517 F.2d 453, 457–59 (2d Cir.1975); *In re Lloyd Securities, Inc.,* 75 F.3d 853, 857 (3d Cir.1996); *In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 74 (Bankr.S.D.N.Y.1996). As SIPC further states, "The SIPA proceeding looks not only to the disposition of claims of customers, but also to the claims of general creditors. Estate property is distributed in the order provided in section 726 of the Bankruptcy Code. The SIPA

trustee has 'the same powers and title with respect to the debtor' and its property as a trustee in bankruptcy, as well as powers that enable him to perform the special functions of a SIPA liquidation." *Id.* at 8, citing, *inter alia, SIPC v. Christian–Paine & Co.*, 755 F.2d 359, 361 (3d Cir.1985); SIPA §§ 78fff(e), 78fff–1(a). See also § 78fff(b) of SIPA, which provides "to the extent consistent with the provisions of" SIPA, a SIPA liquidation proceeding is "conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 of and subchapters I and II of chapter 7 of Title 11."

SIPA was amended in 1978 to provide greater flexibility to a trustee in satisfying customer claims. Among other things, the term "customer property" was added, and defined in § 78*lll*(4), and only customers to whom a "customer name security" was owed (a security registered or in the process of being registered in the customer's name) could be returned in kind, without regard to the limits of SIPA protection. § 78*lll*(3). The trustee was also authorized and directed to purchase securities for customers in satisfaction of claims for securities, if the failed broker-dealer could not satisfy such claims from securities in its possession. § 78fff–2(d).

*The Status of the Claimants as Customers*

■ It is obvious from the structure of SIPA that a claimant's status as a "customer" of the broker-dealer is critical in giving a claimant the right to possible recovery from SIPA funding, as opposed to relegation to the status of general creditor of the estate and recovery only from the proceeds of the liquidation. There is no disagreement among the parties that the Claimants have the status of "customers" within the meaning of SIPA. This follows from the statutory definition of customer, which provides that a "customer" includes "any person who has a claim against the debtor arising out of sales or conversions of such securities...." § 78*lll*(2).[3] Thus, there is no dispute that all of the Claimants are "customers" based upon the unauthorized transactions which occurred in their accounts with Stratton Oakmont. *See Schultz v. Omni Mutual Inc.*, 1993 WL 546671 *3 (S.D.N.Y.) ("Courts within and without this Circuit have held... that SIPA coverage extends to instances of misappropriation."); *In re C.J. Wright & Co., Inc.*, 162 B.R. 597, 607 (Bankr. M.D.Fla.1993) ("SIPA provides customer status for claims based on misappropriation and unauthorized purchases."); *see also SEC v. S.J. Salmon & Co.*, 375 F.Supp. 867, 871 (S.D.N.Y.1974); *In re First State Securities Corp.*, 34 B.R. 492, 495 (Bankr.S.D.Fla.1983); *SEC v. Howard Lawrence & Co.*, 1 B.C.D. 577, 580–81 (Bankr.S.D.N.Y.1975).[4]

■ Having achieved the status of "customer," however, does not mean that a claim is satisfied in full or that a claimant is entitled to damages calculated in accordance with State law. SIPA specifically provides that the Trustee is obligated:

(A) to deliver customer name securities to or on behalf of the customers of the debtor entitled thereto as provided in section 78fff–2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or concurrently

---

**3.** The purpose of this provision was to promote equality of treatment among customers of the broker-dealer whose securities were converted and those whose securities were still on hand when the broker failed. This was also a goal of section 60e of the former Bankruptcy Act, 11 U.S.C. § 96e (repealed 1979), from which part of SIPA was derived. *See SIPC v. Morgan Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir.1976), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976).

**4.** In *In re C.J. Wright & Co., Inc.*, 162 B.R. at 608, the Court distinguished cases cited which denied customer status under SIPA for customer claims based on fraud or breach of contract from those based on unauthorized transactions "because claimants in the cited cases authorized their broker to take some action which the broker failed to take or took action that was not in the claimant's best interest, whereas [in the case of the claimant], debtor used claimants' funds for an unauthorized transaction."

therewith) otherwise satisfy net equity claims of customers to the extent provided in this section.

§ 78fff(a)(1). Since there are no "customer name securities" at issue, the trustee can only satisfy these Claimants' "net equity" claims. With respect to net equity claims, § 78fff–2(b) of SIPA further provides that:

> After receipt of a written statement of claim pursuant to subsection (a)(2) of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer (subject to the provisions of subsection (d) of this section and section 78fff–3(a) of this title) insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date. For purposes of this subsection, the court shall, among other things—
>
> (1) with respect to net equity claims, authorize the trustee to satisfy claims out of moneys made available to the trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the debtor available to satisfy such claims; and
>
> (2) with respect to claims relating to, or net equities based upon, securities of a class and series of an issuer which are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee, authorize the trustee to deliver securities of such class and series if and to the extent available to satisfy such claims in whole or in part, with partial deliveries to be made pro rata to the greatest extent considered practicable by the trustee.

Filling out the statutory scheme, § 78lll(11) defines "net equity" as follows:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date; plus
>
> (C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff–2(a) of this title).

Under the structure of the governing statute, the trustee must satisfy net equity claims whether they are based on cash or securities in accordance with the SIPA mandate. With respect to the satisfaction of net equity claims for cash or securities, the Trustee must satisfy them with cash or securities on hand, if any, and with respect to net equity claims for cash or for securities, the Trustee must satisfy such claims from SIPA funding, up to the ceilings provided in the statute, when there are insufficient funds or property of the debtor available. Section 78fff–2(d), as amended in 1978, requires the trustee to purchase securities, to the extent available in an orderly market, to satisfy customer claims based on securities.

■ Because of the statutory requirements, any demand by the Claimants for "damages" for conversion based on state law damage theories must be rejected. Many cases have held SIPA permits only the satisfaction of net equities and not the payment of damages. *See In re Bell &*

*Beckwith,* 937 F.2d 1104, 1106 (6th Cir. 1991); *In re Adler Coleman Clearing Corp.,* 195 B.R. 266, 273 (Bankr.S.D.N.Y. 1996); *cf. Arford v. Miller,* 239 B.R. at 702. The demand of certain of the Claimants for a return to them of their "customer property" is also misplaced. Although § 78fff(a) speaks of the Trustee's duty, upon appointment, to promptly distribute customer property and to "otherwise satisfy net equity claims of customers," there is no separate entitlement under SIPA to return of "customer property."[5] The definition of "customer property" in § 78lll(4) establishes that it is a fund consisting not of property of specific customers or investors but of "cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." It is specifically defined to include "any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers...." § 78lll(4)(D). It is thus a common fund from which customers' net equity claims generally can be satisfied, with SIPC to make up any shortfalls within the limits of SIPA protection. See § 78fff–3(a), which provides that SIPC shall advance moneys "to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property."

*The Trustee's Net Equity Calculations*

As noted above, the Trustee determined in each of the cases before the Court that the Claimants were customers and were entitled to recovery of their "net equities" in accordance with the statute. In each case he further determined that he would return the account to what he termed "its status quo ante as if the unauthorized transactions had not occurred" and transmit to the Claimant the same number of shares of the securities that had been sold from the Claimants' account, without authorization, and that had apparently provided the cash used to make another, equally unauthorized purchase.

For his right to provide stock, the Trustee relies on § 78fff–2(d) of SIPA, which specifically provides that a net equity claim for securities shall be satisfied by a transfer of the securities to the customer, to the extent such securities can be purchased by the trustee in a fair and orderly market.[6] In response to the Claimants' argument that the stock offered is virtually worthless in today's market, the Trustee cites many cases that provide that SIPA offers investors of a failed broker-dealer, and even entities who have the status of customers, limited relief. *See, e.g., SEC v. Packer, Wilbur & Co.,* 498 F.2d at 983 ("SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customer."); *In re Adler Coleman Clearing Corp.,* 195 B.R. at 272 (recognizing that "SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all customers whole."); and the prior decision of this Court in this very case, *SIPC v. Stratton Oakmont, Inc.,* 229 B.R. at 277 (recognizing that "SIPA protection is not an absolute privilege but a qualified one which depends primarily on the nature of the claim and the purpose of the client's account with the defunct broker-dealer. But not all investors are cus-

---

**5.** There is a right to receive back in kind "customer name securities." But the claimants here have no right to customer name securities, as no securities registered in their names were held by the Debtor on the Filing Date.

**6.** To the extent a SIPA trustee is unable to deliver securities in satisfaction to a customer claim for securities, the trustee is obligated to deliver cash, with the securities valued as of the Filing Date. *See Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. 880, 892 (D.N.J. 1988).

tomers; moreover, an investor can be a customer vis-a-vis certain transactions but not others.").

■ The critical predicate underlying the Trustee's determination is that the Claimants herein have a claim for net equities based on securities, not cash. While net equity claims of customers for securities are satisfied with securities, cash net equity claims are satisfied with cash. The Trustee has provided the Court with two examples of his determinations in the Stratton Oakmont matter as to claims of customers for cash used in unauthorized trading. In one example, claim no. 3286, the claimant alleged to the Trustee's satisfaction that in 1994 Stratton Oakmont had purchased certain shares of stock for him for $202,510, without his authorization. The shares were subsequently sold for $106,865, resulting in a loss to the account of $95,645. The Trustee determined that this customer's net equities calculation required the return to the customer of the net loss, $95,645, in full satisfaction of the claimant's customer claim. The resolution of claim no. 2463 is similar. These determinations appear to be fully in accord with the cases that involve customer claims for cash, as opposed to securities, based upon the unauthorized purchase of securities with cash. See *SEC v. Howard Lawrence & Co., Inc.*, 1 B.C.D. at 580–81, where funds of claimant Farrugia were invested without authority and the customer was held to have a claim covered by SIPA for the return of the cash; and *SEC v. S.J. Salmon & Co., Inc.*, 375 F.Supp. at 871, where the customer was unable to prove that the investment of his cash was made without authority, but where the court said:

I conclude that this statutory scheme was designed to facilitate the return of the property of customers of insolvent brokerage firms or, where this cannot be done, to reimburse such customers if their property has been lost or misappropriated. Misappropriation would, of course, include the use of the customers'

money to effect unauthorized purchases of securities. Thus if Judge Herzog [the bankruptcy referee below] had found the Fiberstatics purchase to have been unauthorized, [claimant] would possess a valid customer claim for the return of the [cash]. 375 F.Supp. at 871.

The proper characterization of the claims of the customers herein, for securities or for cash, is therefore important in terms of the recovery to which they are entitled under the net equities calculation.

The Trustee determined that the claims of the Claimants herein are for securities rather than for cash based on the proposition that their accounts held securities "prior to" the unauthorized transactions. The question, however, is prior to what? In each of the Claimant's accounts, before the last unauthorized transaction, the account held or was owed cash which was then used to effect the unauthorized purchase. Admittedly, this cash consisted of proceeds from a previous unauthorized transaction, the sale of securities of the customer without authorization. But the real question herein is whether the Trustee was correct when he collapsed two distinct wrongs: in one wrong, Stratton Oakmont sold stock without authority and turned the stock into cash, thereby cashing the customer out; in the other wrong, the broker took the cash and invested it in a stock whose purchase the customer did not authorize, thus tying up the customer's funds in an involuntary investment.

■ Nothing in the definition of "net equities" bears on the question whether the two wrongs here can be treated as if they were one. Indeed, SIPA does not define "claim for cash" or "claim for securities." SIPC has adopted rules that govern the question whether a claim is a "claim for cash" or a "claim for securities" where a SIPC member placed into liquidation holds cash in the customer's account subject to an executory contract for the purchase and sale of a security. 17 C.F.R. §§ 300.501, 300.502. But the provisions of 17 C.F.R. §§ 300.501, 300.502 are

inapplicable to the case at bar, and no other relevant SIPA authority been cited. Nor is any help provided by the cases cited by the Trustee on the issue whether a customer is entitled to receive cash or securities, as none of these cases involved unauthorized transactions in the customer's account.[7] It is also established, as the Trustee argues, that claims based solely upon failure to execute sale orders; market losses during the pendency of the SIPA proceeding; and allegations of breach of contract and fraud are not "customer" claims under SIPA. *See SIPC v. Stratton Oakmont, Inc.,* 229 B.R. at 280; *In re Adler Coleman Clearing Corp.,* 195 B.R. at 275; *SEC v. Howard Lawrence,* 1 B.C.D. at 579; *In re First State Securities Corp.,* 34 B.R. at 496–97.[8] However, none of these principles bears on the question at hand, whether the Claimants can pursue a claim for cash based upon the last of the unauthorized transactions in their accounts without being forced in effect to pursue an independent claim based upon another transaction and accept the remedy for that wrong as the sole remedy for both.

There is a single case which is directly on point. In *In re First State Securities Corp.,* 34 B.R. 492 (Bankr.S.D.Fla.1983), the debtor, a broker-dealer, manipulated and inflated the prices of stocks which it purchased, without authorization, in several claimants' accounts. These unauthorized purchases "were funded either with cash from one of the accounts, funds borrowed on margin, the unauthorized sale of stock in one of the accounts, or a combination of these sources." *Id.* at 495. Claimant Alward, in claim no. 802, sought the recovery of $41,250 based on the unauthorized purchase of stock in his account, which was funded in part by the unauthorized sale of stock and in part by funds borrowed on margin. *Id.* at 497. The court concluded that this claim was for net equities based on cash as opposed to securities and, offsetting the claim by $5,384 (an amount of which Alward was "indebted to the debtor"), the court allowed the claim in cash in the amount of $35,866. *Id.*

The result in *First State Securities Corp.* is persuasive in that it establishes a direct, bright-line test, determining the nature of a customer claim on the basis of the transaction actually complained of. The statute does not specifically authorize a trustee to search through earlier records to satisfy a net equity claim for cash as if it were a net equity claim for securities. Any such action, collapsing two wrongs and fashioning the remedy on the basis of the first wrong, would also be at odds with non-SIPA law. As indicated above, a SIPA proceeding such as the one at bar proceeds in the same fashion as a Chapter 7 liquidation, and under general principles of bankruptcy and non-bankruptcy law applicable in a Chapter 7 liquidation a trustee could not merge the two wrongs into

---

7. In *In re June S. Jones Co.,* 52 B.R. 810 (Bankr.D.Or.1985), the claim was quite clearly for "customer name securities," and the court properly held that the trustee was entitled to satisfy such claims by delivery of securities even though the securities were in the process of being registered on the filing date. § 78fff–2(c)(2). In *In re Adler Coleman Clearing Corp.,* 195 B.R. 266 (Bankr.S.D.N.Y. 1996), there were two classes of claimants who objected to the determination of the trustee, those seeking market losses for the period between the filing date and the date the accounts were transferred and those seeking cash as a result of the failure to execute sale orders prior to the filing date. The court concluded that such claims are not entitled to "customer" status at all under SIPA. In *SIPC v. Associated Underwriters, Inc.,* 423 F.Supp.

168 (D.Utah 1975), the claimants deposited cash for the purpose of purchasing securities at the discretion of the broker-dealer and securities were in their accounts as of the filing date; the court held the claims were clearly for securities.

8. For this reason, the settlement agreement between the Dequine Trusts and Stratton Oakmont, in which the Debtor agreed to pay $183,000, does not enhance these Claimants' customer claims. A breach of contract claim entitles a party only to file a general unsecured claim against the broker-dealer and not to any recovery as a customer. *See also In re MV Securities,* 48 B.R. 156, 160 (Bankr. S.D.N.Y.1985).

one and preclude the Claimants herein from asserting a claim for the cash that was involuntarily invested by Stratton Oakmont in the last unauthorized transaction.

In short, there is nothing in either bankruptcy or non-bankruptcy law that would require that the two related but distinct wrongs here be merged into one or that would prevent the complaining party from recovering only in respect of the latter wrong. In a securities fraud lawsuit, for example, the plaintiff would be able to claim damages as a consequence of each of the wrongs that the Claimants here suffered. In connection with the first wrong, the customer could claim the highest value of the stock within a reasonable period after the sale minus the proceeds he received. In connection with the second, the customer could claim for the price he paid on the involuntary investment, minus the lowest price the security reached a reasonable time after the transaction. *See* 5D Jacobs, *Litigation and Practice Under Rule 10b-5* § 260.03[c][vii][P] at 11-134 (2000). Admittedly, 10b-5 damage calculations are not directly on point in a SIPA liquidation. Nevertheless, where SIPA is silent, non-SIPA law is relevant on the question whether the Trustee is required or permitted in this SIPA proceeding to merge the two wrongs and insist on "returning" to the Claimant the stock that was involuntarily sold rather than the cash that was involuntarily invested.

There is also nothing in bankruptcy law that precludes a creditor from framing its claim against a debtor. Section 501 of the Bankruptcy Code provides that a creditor must file a claim in order to participate in any recovery, but a claim encompasses only the matters contained therein. *See generally In re Simmons*, 765 F.2d 547 (5th Cir.1985); *In re Integrated Resources, Inc.*, 157 B.R. 66 (S.D.N.Y.1993); *In re Andover Togs, Inc.*, 231 B.R. 521 (Bankr. S.D.N.Y.1999); *In re Macmillan, Inc.*, 186 B.R. 35 (Bankr.S.D.N.Y.1995). Section 502(d) of the Bankruptcy Code provides that the court "shall disallow any claim of any entity from which property is recoverable" under various sections of the Code, thereby protecting the estate from paying out on claims filed by entities against whom the estate has certain specified rights. But this section is inapplicable here, as § 502(d) is purely defensive, and the Trustee has not suggested he has any claims against these Claimants of the type specified in § 502(d). *See In re Parker North American Corp.*, 24 F.3d 1145, 1155 (9th Cir.1994).

Throughout his papers, the Trustee paints SIPA as a restitutionary statute, generally requiring securities to be issued in response to a claim for securities and requiring the delivery of customer name securities where they are available. Section 78fff-1(b)(1), however, merely provides that it is the trustee's duty to deliver securities "to the maximum extent practicable in satisfaction of *customer claims for securities* ..." (emphasis added). The duty of a SIPC trustee to return physical property wherever possible was reinforced by the amendment of the statute in 1978 which authorized the trustee to purchase securities in order to satisfy customer claims for securities. The amendments added section 78fff-2(d), which requires the trustee where practical to deliver securities to customers "in order to restore the accounts of such customers as of the filing date." Section 78fff-2(d), however, also governs only "net equities based on securities under section 78fff-1(b)(1)." Neither of these provisions applies to a claim for net equities based on cash or answers the question whether a customer's claim is for cash or for securities. The Trustees' contention that he should restore these Claimants' accounts to their position on the Filing Date, is also unconvincing in that these customers apparently closed out their accounts with the Debtor years before the Filing Date.

Contrary to the arguments of the Trustee and SIPC, a holding that the Claimants here have a claim to cash for

the misappropriation of their cash would be consistent with the only authority directly on point, *First State Securities Corp.,* and with basic principles of bankruptcy and non-bankruptcy law. It would also carry out SIPA's remedial principles, which the Supreme Court has said should be interpreted "not technically and restrictively, but flexibly to effectuate [its] remedial purposes." *Pinter v. Dahl,* 486 U.S. 622, 653, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (citations omitted); *see also In re First State Securities Corp.,* 34 B.R. at 496, citing *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) ("SIPA is remedial legislation. As such it should be construed liberally to effect its purpose.").

*Specific Methodology of Claim Calculation*

As noted above, the Trustee also determined that the Claimants were required to "return" to the estate certain proceeds of the stock Stratton Oakmont had purchased for them without authority and also other cash amounts. For example, in the case of Mr. Heidal, the Trustee determined that Heidal was the victim of an unauthorized sale of Select Media, of whose proceeds $49,010 was used to purchase Solomon Page stock, with the balance of $948.75 sent to him along with $417.88 then in his account. When the unauthorized Solomon Page stock was eventually sold, he received proceeds of $8,740. The Trustee determined that in order to receive 6500 shares of Select Media, then worth virtually nothing, Heidal would have to "return" the proceeds of $8,740 and the $948.75 difference between the sales price of Select Media and the purchase price of Solomon Page.

 If the Trustee had determined that Heidal and the other Claimants had a claim for net equities based on cash rather than securities, it would have been appropriate for him to reduce their claims dollar for dollar by the cash they received when they disposed of the securities that were purchased for them without authority.

Assuming *arguendo,* however, that the Trustee was right to insist on delivering securities to these Claimants, he had no basis on which to insist that the Claimants return to him cash worth 100 cents on the dollar while he was obligated to deliver only stock of little value. Any such result would raise the concept of Pyrrhic victory to a new level, requiring the victim of fraud to pay far more than the value of his recovery, and would at least raise the question whether the statutory drafters could possibly have intended this result. There is nothing in SIPA or non-SIPA law to indicate that they did.

As to SIPA, nothing in the definition of net equities bears on the issue whether the Trustee can require the victim of unauthorized trading to pay back proceeds in cash while receiving securities of much less value. The SIPA definition of "net equities" provides that there shall be subtracted "any indebtedness of such customer to debtor on the filing date" from the "sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer". 15 U.S.C. § 78*lll*(11). There was, however, no "indebtedness" of any Claimant to the Debtor on the Filing Date. Heidal, for example, did not have a "debt" to Stratton Oakmont on the Filing Date, and the Debtor obviously could not have brought an independent action against Heidal seeking the proceeds of the stock that it had fraudulently purchased for him. Nor, as another example, did Nimri have an indebtedness to the Trustee of the Filing Date value of the shares that the Debtor had bought for him without authority. The Debtor did have a right to insist that Heidal and Nimri mitigate their damage claims, but this does not give rise to an independent "indebtedness" on the part of either Claimant.

Since SIPA does not itself govern this issue, the question is again one to be determined under general bankruptcy law principles or principles of State law rele-

vant in bankruptcy liquidations. In a suit to redress the Debtor's wrong, the Claimants would be required to reduce their damage claims and seek compensation only for the net loss. Similarly, in a bankruptcy, if Heidal filed a proof of claim for fraud, he would be entitled to claim only for his net loss. In either case, Heidal would be required to mitigate damages by reducing the size of his claim; he would not have to pay 100–cent dollars if he was receiving from the bankrupt or the defendant a recovery measured only in cents on the dollar. *See generally Restatement of the Law, Torts* § 920 comment (d) (1979), emphasizing that damages in all cases need be mitigated only to the extent it is equitable to do so. It is certainly not equitable for a trustee to require payment from claimants in 100 cent dollars if he is proposing to pay out in property worth much less.

 The law of restitution is similar. To the extent the Trustee is seeking to rescind the unauthorized transactions and to restore the *status quo ante*, he is seeking restitution or at least rescissional damages. "Restitution is granted to the extent and only to the extent that justice between the parties requires." *Restatement of the Law, Restitution* at 596 (1937). A party's right to restitution or rescission may be lost by a subsequent change in the defendant's position, which destroys the unjust enrichment that restitution seeks to prevent. *See* Prosser and Keeton, *Law of Torts* 675 (1984). Here, assuming *arguendo* that the Trustee had the right to satisfy these Claimants' claim for net equities by delivering securities, he could only seek a mitigation of damages by subtracting the proceeds from the amount of the claim, in order that 100–cent dollars be subtracted from 100–cent dollars.

## Conclusion

The Court holds that the Claimants have a customer claim for net equities based on cash, and that the Trustee's determination, which treated this claim as if it were a claim for net equities based on securities, is annulled. The Court further holds that any request of the Claimants for damages based on conversion, for a return of "customer property," or for breach of contract is also rejected. The matter is remitted to the Trustee to recalculate and settle an order that allows these claims in accordance with the principles set forth herein, subject to the $100,000 ceiling on SIPA cash payments to the extent applicable.